UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESCAP LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>FIRST CALIFORNIA MORTGAGE COMPANY; CHRISTOPHER HART; DENNIS HART; ELIZABETH HART-ARMSTRONG; DAVID ARMSTRONG; SEAGULL SERVICES, LLC; FIRST CALIFORNIA LENDING SOLUTIONS; HART FAMILY FOUNDATION; D.M.H. FAMILY LIMITED PARTNERSHIP; TIVOLI ASSET MANAGEMENT, INC.,<br><br>Defendants. | Case No. 18-cv-03283-WHO<br><br>**ORDER DENYING MOTION TO PARTIALLY DISMISS THE COMPLAINT**<br><br>Re: Dkt. No. 20 |

**INTRODUCTION**

Plaintiff Rescap Liquidating Trust ("Rescap") accuses Defendant First California Mortgage Company ("FCMC") and various officers and owners of FCMC of fraudulently transferring funds from FCMC to avoid paying Rescap pursuant to a prior settlement agreement. Defendants move to dismiss on a variety of grounds that are not well taken. Importantly, they argue that Rescap cannot seek funds transferred prior to the date of the settlement agreement because of the agreement's release provision, but the scope of the release provision does not encompass the allegedly fraudulent transfers. They also argue that the agent's immunity rule or their status as third party beneficiaries protects them from suit, that there was no special relationship between the individuals and Rescap, that Rescap's economic interference claims are duplicative, that the individuals owed no duty of care, and that Rescap failed to state a claim for conversion. None of these arguments hold water, particularly at the motion to dismiss stage. For the reasons stated below, defendants' motion is denied**.**

# BACKGROUND[1]

Rescap is an express Delaware statutory trust and the successor-in-interest of Residential Funding Company, LLC ("RFC"), a party to the Amended Settlement Agreement at issue in this suit. Complaint ("Compl.") [Dkt. No. 17] ¶¶ 1, 9. RFC was in the business of acquiring residential mortgage loans form mortgage originators and selling them into residential mortgage-backed securitization trusts or to whole loan purchasers. *Id.* ¶ 23. RFC filed for Chapter 11 bankruptcy in May 2012 and no longer engages in active business operations. *Id.* ¶¶ 9, 26.

FCMC is a closely-held California corporation with its former place of business in Petaluma. *Id.* ¶ 10. It was in the business of originating and selling residential mortgage loans. *Id.* Rescap alleges that individual defendants Christopher Kamin Hart ("Kamin Hart"), Dennis Hart ("Hart"), Elizabeth Hart-Armstrong ("Hart-Armstrong"), and David Armstrong ("Armstrong) (collectively the "Individual Defendants") own, manage, and control FCMC. *Id.* Rescap also alleges that defendants Hart Family Foundation, Seagull Services LLC, First California Lending Solutions, D.M.H. Family Limited Partnership, and Tivoli Asset Management (collectively the "Affiliate Defendants") are affiliates of FCMC and are owned and controlled by the Individual Defendants. *Id.*

## I. RFC AND FCMC'S BUSINESS DEALINGS

Before going bankrupt, RFC purchased loans from FCMC. *Id.* ¶ 24. Over the course of RFC and FCMC's business dealings, RFC acquired over 300 mortgage loans from FCMC, with an original principal balance of over $125 million. *Id.* ¶ 25. Due to the failure of correspondent lenders, including FCMC, to honor their contractual representations and warranties concerning loans purchased by RFC, RFC was later sued by numerous counterparties and investors in its residential mortgage-backed securitization trusts. *Id.* ¶ 26. As a result of these lawsuits, RFC was forced to file Chapter 11 bankruptcy petition. *Id.* The bankruptcy petition resulted in a global settlement of RFC's residential mortgage-backed securities related liabilities for over $10 billion in allowed claims. *Id.* ¶ 27. Under the global settlement, Rescap succeeded to certain of RFC's

---

[1] I accept Rescap's allegations in the Complaint as true for the purposes of this motion.

rights and is responsible for monetizing many of the debtors' remaining assets and pursuing litigation claims, including RFC's rights against FCMC. *Id.* Proceeds recovered by Rescap are distributed to creditors after costs and expenses. *Id.*

## II. THE MINNESOTA LAWSUIT, THE SETTLEMENT AGREEMENT, AND FIRST DEFAULT

On December 13, 2013, RFC filed a complaint against FCMC in the action styled *Residential Funding Company, LLC v. First California Mortgage Company*, No. 13-CV-3453 (D. Minn.) asserting claims for breach of contract and indemnification (the "Minnesota Litigation"). *Id.* ¶¶ 2, 28. The Minnesota Litigation concerned alleged failures to abide by RFC's Client Contract and Client Guide. Compl. ¶ 24. The Client Contract and Client Guide set out stringent loan-level contractual representations and warranties made by the correspondent lender (FCMC in that case) that were designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans RFC purchased. *Id.*

Nearly three years later, Rescap, RFC, and FCMC entered into a Settlement and Release Agreement (the "Settlement Agreement"), with FCMC agreeing to pay $6 million to Rescap under a set payment schedule. *Id.* ¶¶ 2, 29. Under the terms of the Settlement Agreement, if FCMC defaulted on the payment schedule, FCMC was obligated to pay Rescap $7 million less any payments already made. *Id.*

As managers and members of the closely-held FCMC, each Individual Defendant considered and approved the Settlement Agreement. *Id.* ¶ 30. Kamin-Hart signed the Settlement Agreement as FCMC's President and CEO. *Id.* Hart and FCMC's counsel also signed Affidavits of Confession of Judgment in the event FCMC defaulted on its payment obligations. *Id.* FCMC made the first required payment under the Settlement Agreement of $83,750, the second required payment of $167,500, and the third required payment of $251,250. *Id.* ¶ 31. FCMC failed to make the fourth required payment of $251,250. *Id.*

After FCMC failed to make the fourth required settlement payment, Rescap sought entry of a confessed judgment pursuant to the terms of the Settlement Agreement. *Id.* ¶¶ 3, 31. On July

3

24, 2017, the Sonoma County Superior Court entered judgment in Rescap's favor pursuant to a Confession of Judgment for $6,497,500, as well as statutory post-judgment interest until the judgment was paid in full (the "Original Judgment"). *Id.* ¶¶ 3, 32.

## III. THE AMENDED SETTLEMENT AGREEMENT, SECOND DEFAULT, AND SHUTDOWN OF FCMC

After entry of the Original Judgment, FCMC contacted Rescap and allegedly represented that it was negotiating its sale and would pay the total amount owed under the Settlement Agreement out of the sale proceeds, which would be sufficient to pay Rescap and FCMC's other creditors in full. *Id*. ¶ 33. FCMC requested that Rescap forbear on enforcing the Original Judgment to allow FCMC additional time to pay Rescap a lump sum out of sale proceeds. *Id.*

On August 4, 2017, the parties entered into an Amendment to Settlement and Release Agreement (the "Amended Settlement Agreement"). *Id.* ¶¶ 5, 34. The Amended Settlement Agreement required FCMC to make a single lump-sum payment to Rescap of $6,697,074 on November 3, 2017 (the "Balloon Payment"). *Id.* The obligation to make the Balloon Payment was not contingent on FCMC's sale. *Id.* ¶ 34. The Amended Settlement Agreement also allowed Rescap and RFC to seek entry of an amended judgment in the amount of $6,497,500, as well as statutory post-judgment interest until satisfied. *Id.* ¶¶ 5, 34. The Sonoma County Superior Court entered an amended judgment on September 20, 2017 (the "Amended Judgment"). *Id.* But FCMC failed to make the balloon payment. *Id.* ¶ 7.

Under the Amended Settlement Agreement, FCMC agreed that it would not dispose of its assets, other than in the ordinary course of its business, for fair consideration without RFC's prior written consent. *Id.* ¶ 36. FCMC also granted Rescap a security interest in and to the proceeds of FCMC's sale, or the sale of any of its assets other than in the ordinary course of its business for fair consideration, up to the amount of the Balloon Payment. *Id.* ¶ 37. The Amended Settlement Agreement also stated that proceeds of the sale of FCMC or any of its assets, other than assets sold in the ordinary course of business for fair consideration, would be held by a third-party escrow company in trust for the benefit of Rescap. *Id.* ¶ 38. Further, none of the above proceeds could be paid to First California, its shareholders, owners, directors, officers, employees, or any other

4

person, until the Balloon Payment was paid in full. *Id.*

On October 24, 2017, Rescap filed a Uniform Commercial Code financing statement with the California Secretary of State to perfect its security interest. *Id.* ¶ 37; Exhibit D.

At some point in November 2017, without notifying Rescap, FCMC shut down its operations, surrendered all of its leaseholds, wiped all of its computers remotely, and told landlords they were free to salvage anything left on FCMC's former premises. *Id.* ¶¶ 8, 46.

**IV. THE ALLEGEDLY FRAUDULENT TRANSFERS**

While the Minnesota Litigation was pending, and the Settlement Agreement was being negotiated, the Individual Defendants began transferring FCMC's assets to themselves and the Affiliate Defendants. *Id.* ¶¶ 3, 42. From approximately June 2014 to at least March 2018, FCMC allegedly transferred at least $15,208,274 to the Individual and Affiliate Defendants under the pretext of salaries, notes, interest, loan fees, distributions, professional fees, and subleases without receiving reasonably equivalent value. *Id.* ¶ 6, 42. Rescap identifies a number of these payments in its Complaint. *Id.* ¶¶ 42-44. $12,375,787 was transferred before September 23, 2016, the date of the Settlement Agreement, and $2,832,487 was transferred after the Settlement Agreement. Exhibit I [Dkt. No. 17-9] attached to the Compl. Rescap claims that these transfers were made to hinder, delay, or defraud FCMC's creditors, including Rescap. *Id.* ¶ 6. FCMC was either insolvent at the time it made the transfers or made insolvent as a result of the transfers. *Id.*

On or about March 7, 2018, FCMC's counsel stated that FCMC had no assets left to pay the Amended Judgment. *Id.* ¶ 47. FCMC's counsel stated that the only remaining asset was a claim for a refund of a security deposit on a bond, which the bonding company indicated it would keep for another year to see if any claims were brought against the bond. *Id.*

FCMC never sought Rescap's consent prior to disposing of FCMC's assets in the course of shutting down its operations and never placed the proceeds from its disposed assets in escrow toward the Balloon Payment. *Id.* ¶ 48. Rescap alleges that the defendants acted with malice, oppression, or fraud in stripping FCMC of its assets for the benefit of the Individual and Affiliate Defendants, leaving FCMC an empty shell unable to satisfy its settlement obligations. *Id.* ¶ 49.

Against all defendants, Rescap brings claims for (1) avoidance and recovery of

intentionally fraudulent conveyance, (2) avoidance and recovery of constructively fraudulent transfers, and (6) conversion. *Id.* ¶¶ 50-67, 101-107. Against the Individual Defendants, Rescap brings claims for (3) intentional interference with contract, (4) intentional interference with prospective economic advantage, and (5) negligent interference with prospective economic advantage. *Id.* ¶¶ 68-100.

**LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). This standard is not akin to a probability requirement, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

**DISCUSSION**

**I. RESCAP'S CLAIMS FOR RELIEF BASED ON TRANSFERS OCCURING PRIOR TO THE SEPTEMBER 23, 2016 SETTLEMENT AGREEMENT**

Defendants argue that the release of claims in the Settlement Agreement bars Rescap's claims to the extent that they are premised on pre-settlement transactions taking place before September 23, 2016. Motion to Dismiss ("Mot.") [Dkt. No. 20] 9-14.

As an initial matter, the Settlement Agreement states that it shall be construed and interpreted in accordance with the laws of the State of Minnesota. Settlement Agreement § 13 attached as Exhibit A [Dkt. 17-1] to the Compl. Rescap contends that California and Minnesota law do not differ on this point and defendants do not disagree. Opposition ("Oppo.") [Dkt. 28] 7

n.4. Accordingly, I shall interpret the Settlement Agreement under California law.

Release agreements are interpreted using general principles of contract interpretation. *See e.g., Winet v. Price*, 4 Cal. App. 4th 1159, 1166 (1992). "If contractual language is clear and explicit, it governs." *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992). Releases "regulate and settle only such matters and differences as appear clearly to be comprehended in them by the intention of the parties and the necessary consequences." *Folsom v. Butte Cty. Assn. of Governments*, 32 Cal. 3d 668, 677 (1982). Specific provisions control in a release which contains both specific and general provisions. *Iqbal v. Ziadeh*, 10 Cal. App. 5th 1, 12 (Ct. App. 2017) (citations omitted).

The Settlement Agreement states in relevant part that it was intended to "resolve the Litigation [and to] reach a full and fair compromise resolution of all claims *concerning the Subject Loans*." Settlement Agreement § 1 (emphasis added). The release clause then states that:

> The RFC parties . . . hereby forever release, remise, acquit, stand satisfied and forever discharge [FCMC] and, each solely in their capacity as such, its present and former parents, subsidiaries, affiliates, employees, officers, directors agents, representatives, predecessors, heirs, successors, attorneys, insurers and assigns . . . from any and all manner of claims, actions, causes of action, charges, suits, rights, debts, dues, sums of money, accounts, reckonings, bonds, bills, damages, judgments, executions, obligations, attorney's fees, costs, expenses, liabilities, and demands of any kind or nature whatsoever, at law or in equity, which it may have had, ever had, claims to have had, now has or which its Affiliates, employees, officers, directors, agents, representatives, heirs, successors , attorneys, insurers and assigns hereafter can, *shall or may have solely relating to the Subject Loans* (the "Released Claims"); provided, however, that the Released Claims shall not include the obligations and agreements undertaken by Defendant in this Agreement.

Settlement Agreement § 4 (emphasis added).

In the Minnesota Litigation, Rescap and RFC sued FCMC for alleged failures to abide by RFC's Client Contract and Client Guide. Compl. ¶ 24. The Client Contract and Client Guide set out stringent loan-level contractual representations and warranties made by FCMC which were designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans RFC purchased. *Id.* Reading the Settlement Agreement in the context of the Minnesota Litigation, it is clear that "claims related to the Subject Loans" refers to

Rescap and RFC's claims that FCMC violated the Client Contract and Client Guide when it sold loans to RFC. The language of the Settlement Agreement does not encompass all causes of action that might arise between the parties. To the extent that the Settlement Agreement contains both specific and general provisions, the specific terms related to the subject loans control the scope of the release. *Ziadeh*, 10 Cal. App. 5th at 12.

Defendants cite *Folsom* in support of their contention that release in the Settlement Agreement extends to the alleged scheme of fraudulent transfers. Mot. 20. *Folsom* states that releases cover matters that clearly appear to have been comprehended by the parties, along with the "necessary consequences" of those matters. 32 Cal. 3d at 677. Viewing the allegations in a light most favorable to non-moving party, I find the alleged scheme of fraudulent transfers did not clearly appear to have been comprehended by the parties and were not a necessary consequence of FCMC's alleged violations of the Client Contract and Client Guide. For the release to extend to conduct not alleged in the Minnesota Litigation, the conduct would have to stem from new theories or facts related to FCMC's alleged violations of the Client Contract and Client Guide. Under defendants' expansive reading of the Settlement Agreement, it is difficult to comprehend what would not be related to the Subject Loans. Applying defendants' reading, if two parties had signed a release for claims related to securities law, and then quarreled at a bar after an argument about the released securities law related claims, neither could bring a battery action against the other. The release cannot be reasonably interpreted in such a way.

Defendants also argue that to find the alleged scheme of fraudulent transfers to be unrelated to the Subject Loans is a "distinction where there is no difference." Reply at 6. Defendants cite *Winet v. Price* in support of their argument that the Settlement Agreement should encompass the alleged fraudulent transfer scheme. Reply at 8-9. In *Winet*, the defendant was an attorney being sued for malpractice and the plaintiff was a prior client of the attorney. 6 Cal.Rptr. at 555. The parties had a general release which released "any and all . . . claims, . . . damages and causes of action whatsoever, of whatever kind or nature, whether known or unknown, or suspected or unsuspected . . . against any other Party . . . [a]rising out of or in any manner connected with the performance of legal services by [Price or his law firms] for [Winet or his

8

entities], or any act or omission by any Party in connection with said legal services or any request for the performance of legal services." *Id.* at 555–56 (internal quotations omitted). The parties signed the release in connection with a dispute over legal fees, and the court held that the clear language of the release was enforceable as the plaintiff was aware of possible malpractice claims against the defendant at the time he executed the release, plaintiff executed the release with the advice of counsel, and the parties exempted certain claims from the application of the release. *Id.* at 559. The current case is distinguishable as the release is more specific, Rescap could not have been aware of a possible fraudulent transfer scheme, and the Settlement Agreement's terms reflect that lack of awareness. Further, it would make no economic sense for Rescap to enter into the Settlement Agreement or Amended Settlement Agreement if it knew FCMC would be raided of all it assets.

I find that the language of the release extends to potential claims related to FCMC's alleged violations of the Client Contract and Client Guide and that the alleged fraudulent transfer scheme is clearly unrelated to FCMC's alleged violations of the Client Contract and Client Guide. Defendants' motion to dismiss Rescap's claims related to alleged transfers occurring before the Sept 23, 2016 is denied.

## II. RESCAP'S CLAIMS FOR INTENTIONAL AND NEGLIGENT INTERFERENCE

Defendants argue that the third cause of action for intentional interference with contract, the fourth cause of action for intentional interference with prospective economic advantage, and the fifth cause of action for negligent interference (the "interference claims") must be dismissed pursuant to the agent's immunity rule and because the Individual Defendants are third party beneficiaries. Mot. 15-18. I disagree.

### A. The Agent's Immunity Rule

The agent's immunity rule provides that duly acting agents and employees cannot be held liable for conspiring with their principals. *Doctors' Co. v. Superior Court*, 49 Cal. 3d 39, 45 (1989) ("This rule . . . 'derives from the principle that ordinarily corporate agents and employees acting for and on behalf of the corporation cannot be held liable for inducing a breach of the corporation's contract since [by] being in a confidential relationship to the corporation their action

9

in this respect is privileged,' " *quoting Wise v. Southern Pacific Co.*, 223 Cal.App.2d 50, 72 (1963)). The rule is only a bar to liability when the agent acted solely in an official capacity; if the agent acted for its own benefit, there may be liability. *See Everest Investors 8 v. Whitehall Real Estate Limited Partnership XI*, 100 Cal.App.4th 1102, 1107 (2002).

Defendants contend that Rescap's causes of action based on interference by the Individual Defendants must fail because a party may not interfere with a contract to which it is a party and agents cannot be held liable for interference when acting for and on behalf of the corporation for which they are agents. Mot. 15-16. But taking the facts alleged by Rescap as true, there can be no question that the alleged conduct by the Individual Defendants to siphon away FCMC's assets to themselves and the Affiliate Defendants was not done for, or on behalf of, FCMC. Compl. ¶¶ 42-49. If proven, the Individual Defendants acted for their own benefit in conducting the allegedly fraudulent transfer scheme as FCMC was insolvent at the times of the transfers, or made insolvent because of them. *Id.* ¶ 44.

Defendants argue that Rescap has failed to allege that the Individual Defendants acted outside the scope of their authority. Reply 10-11. Rescap need not use the magic words "scope of authority" in the complaint in order to withstand a motion to dismiss. *Leids v. MetLife Home Loans*, No. CV0907016DMGRZX, 2010 WL 11515286, at *4 (C.D. Cal. Mar. 29, 2010). It need only plead facts that show the Individual Defendants acted outside of their authority. Rescap has done so here as it is necessarily outside the scope of an agent's authority to engage in a fraudulent transfer scheme that renders the principal insolvent.

Defendants' motion to dismiss the Individual Defendants under the agent's immunity rule is denied.

### B. Third Party Beneficiaries and *Marin Tug*

Defendants also argue that as third party beneficiaries, the Individual Defendants may enforce the Settlement Agreement and are barred from interfering with the Settlement Agreement as a matter of law. They cite *Nat'l Rural Telecommunications Co-op. v. DIRECTV, Inc.*, which relied on the stranger test as articulated by the Ninth Circuit in *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 319 F. Supp. 2d 1059, 1072 (C.D. Cal. 2003) (citing 271 F.3d 825, 834

(9th Cir. 2001)).  In *Marin Tug*, the Ninth Circuit interpreted *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, to find that "that the core of intentional interference business torts is interference with an economic relationship by a third-party stranger to that relationship, so that an entity with a direct interest or involvement in that relationship is not usually liable for harm caused by pursuit of its interests."  *Marin Tug*, 271 F.3d at 832 (citing 869 P.2d 454, 461 (1994))

In recent cases, the Ninth Circuit and California Courts of Appeal have found that an "extension of *Applied Equipment's* holding to immunize a third party from tortious interference claims simply because the third party asserts some economic or other interest in a contract would significantly undercut the tort itself and the public policy underlying it." *Popescu v. Apple Inc.*, 1 Cal. App. 5th 39, 53–54 (Ct. App. 2016).  Both courts have found that "[t]o shield parties with an economic interest in the contract from potential liability would create an undesirable lacuna in the law between the respective domains of tort and contract."  *Id.*  (*citing United Nat. Maintenance, Inc. v. San Diego Convention Center, Inc.*, 766 F.3d 1002, 1007 (9th Cir. 2014)).  "A party with an economic interest in a contractual relationship could interfere without risk of facing either tort or contract liability." *Id.*  "This result is particularly perverse as it is those parties with some type of economic interest in a contract whom [sic ] would have the greatest incentive to interfere with it." *Id.*

It would appear that the stranger test relied on by defendants is no longer good law and to apply it to this case would raise the precise concerns identified in *Popescu* and *United Nat. Maintenance*.  Defendants' motion to dismiss based on the Individual Defendants purported status as third party beneficiaries is denied.

**III. THE RELATIONSHIP BETWEEN RESCAP AND THE INDIVIDUAL DEFENDANTS PRIOR TO THE SETTLEMENT AGREEMENT**

Defendants argue that the interference claims predating the Settlement Agreement fail because under California law, the "relationship" that forms the basis of the intentional interference tort must have existed at the time of the allegedly tortious conduct.  Mot. 18 (citing *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 997 (N.D. Cal. 2014)).  They assert that the Settlement Agreement is the source of Rescap's relationship with the Individual Defendants.  Mot. 18

11

In *O'Connor*, the court stated that under California law "the relationship in question need not be a contractual relationship," only "an existing relationship is required." O'Connor, 58 F. Supp. 3d at 997 (internal citations and quotations omitted). Any alleged relationship cannot be based upon "overly speculative expectancies." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal.App. 4th 507, 522, 527 (Cal. Ct. App. 1996). Courts have applied this rule in cases where the alleged interference would prevent a plaintiff from benefitting from transactions with unidentified third persons. *Safeway Stores 23, Inc.*, 42 Cal.App. 4th at 524; *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1312 (N.D. Cal.1997).

Rescap's relationship with the Individual Defendants was not hypothetical when the allegedly fraudulent transfers began to take place in June 2014. Compl. ¶¶ 6, 42. Rescap and the Individual Defendants were parties to the Minnesota Litigation starting in December 2013. *Id.* ¶¶ 2, 28. Rescap alleges that while the litigation was pending and the parties to the Minnesota Litigation were negotiating the Settlement Agreement, the Individual Defendants began transferring FCMC's assets to themselves and the Affiliate Defendants. *Id.* ¶ 3. I find that at the start of the Minnesota Litigation, Rescap's relationship with the Individual Defendants was not hypothetical and that Rescap has sufficiently alleged that it reasonably expected to receive an economic benefit from the Individual Defendants in either damages or in the form of settlement payments. *Silicon Labs Integration, Inc. v. Melman*, No. C08–04030–RMW, 2010 WL 890140 at *2 (N.D.Cal. Mar. 8, 2010)(plaintiffs must prove that they had a relationship with, and expected to receive an economic benefit from, a specific third party).

Defendants' motion to dismiss based on there being no relationship between Rescap and the Individual Defendants before the execution of the Settlement Agreement is denied.

## IV. PROSPECTIVE ECONOMIC ADVANTAGE

Defendants argue that Rescap's fourth cause of action for intentional interference with prospective economic advantage and fifth cause of action for negligent interference with prospective economic advantage must be dismissed because the only economic advantage alleged are the Settlement Agreement and Amended Settlement Agreement, which are the subject of the third claim for interference with contract. Mot. 19. They urge that because the fourth and fifth

claims are "identical in substance" to the third claim, they are entitled to dismissal of the duplicative claims. *Id.*

Defendants' argument fails as a matter of law. California courts have been clear that although the intent requirement for the torts of intentional interference with contract and intentional interference with prospective economic advantage is the same, these torts remain distinct. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1157 (2003). "The tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage." *Id.* (internal citations omitted). "[T]he tort of interference with prospective economic advantage is considerably more inclusive than actions based on contract or interference with contract, and is thus is not dependent on the existence of a valid contract." *Id.* (internal quotes and citations omitted). A "plaintiff who believes that he or she has a contract but who recognizes that the trier of fact might conclude otherwise might bring claims for both torts so that in the event of a finding of no contract, the plaintiff might prevail on a claim for interference with prospective economic advantage." *Id.* at 1158.

As a matter of California law, Rescap's third, fourth, and fifth causes of action are not duplicative for pleading purposes and defendants' motion to dismiss on this basis is denied.

## V. THE NEGLIGENT INTERFERENCE CLAIM

Defendants argue that Rescap has failed to state a claim for negligent interference with economic advantage because Rescap has not identified a duty owed by the Individual Defendants to Rescap, nor any negligent conduct. Mot. 19-20. But California courts have found that the trust-fund doctrine imposes fiduciary duties in cases "where the directors or officers of an insolvent corporation have diverted assets of the corporation for the benefit of insiders or preferred creditors." *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1040–41 (2009) (internal quotations and citations omitted). "[T]he scope of the [trust-fund] doctrine in California is reasonably limited to cases where directors or officers have diverted, dissipated, or unduly risked the insolvent corporation's assets." *Id.*

Rescap has sufficiently alleged that the Individual Defendants were all officers of FCMC. Compl. ¶¶ 11-14. Hart was the former CEO and President of FCMC. *Id.* ¶ 11. Kamin Hart is the

13

current CEO and President of FCMC. *Id.* ¶ 12. Armstrong-Hart is the Secretary of FCMC. *Id.* ¶ 13. Armstrong was the executive vice president and chief operating officer of FCMC. *Id.* ¶ 14. Rescap has alleged that the Individual Defendants diverted assets to themselves and the Affiliated Defendants they controlled. *Id.* ¶¶ 42-49. These allegations are sufficient to find that the Individual Defendants owed Rescap a duty under the trust-fund doctrine for the purposes of this motion.

Defendants' cited authority, *AccuImage Diagnostics Corp v. Terarecon, Inc.*, is distinguishable. 260 F. Supp. 2d 941, 957 (N.D. Cal. 2003). In *Terarecon*, the court reasoned that because competitors do not owe each other a duty of care not to engage in economic competition, the plaintiff could not state a negligent interference claim. *Id.* at 957-58. Here, duty has been sufficiently alleged.

Additionally, while much of the conduct described in the Complaint appears to be intentional conduct, Rescap has pleaded sufficient facts to state a claim for negligent interference with prospective economic advantage. Compl. ¶¶ 93, 95-97. Rescap has pleaded that the Individual Defendants failed to act with reasonable care by diverting FCMC's assets to themselves in violation of their duty to Rescap as articulated by the Settlement Agreement and Amended Settlement Agreement.

**VI. CONVERSION**

Defendants argue that Rescap has failed to state a claim for conversion because Rescap has failed to identify the converted property with specificity and that Rescap's lien rights are insufficient to state a claim as a matter of law. Mot. 21-22.

Plaintiffs are only required to allege conversion of a sum that is capable of identification in order to survive judgment on the pleadings. *Brock v. Concord Auto. Dealership LLC*, No. 14-CV-01889-HSG, 2015 WL 3466543, at *6 (N.D. Cal. June 1, 2015). Money may be the subject of conversion if the claim involves a specific, identifiable sum; it is not necessary that each coin or bill be earmarked. *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 209 (2014) (internal citations omitted). To state a claim for conversion "[n]either legal title nor absolute ownership of the property is necessary. *Plummer v. Day/Eisenberg, LLP*, 184 Cal. App. 4th 38, 45–46 (2010),

as modified on denial of reh'g (May 21, 2010). "A party need only allege it is 'entitled to immediate possession at the time of conversion.'" *Id.* " The existence of a lien . . . can establish the immediate right to possess needed for conversion." *Id.* "One who holds property by virtue of a lien upon it may maintain an action for conversion if the property was wrongfully disposed of by the owner and without authority." *Id.* (internal citations omitted).

Rescap has alleged conversion of a sum of money capable of identification. The Amended Settlement Agreement states that Rescap is entitled to a balloon payment of $6,697,074. Compl. ¶¶ 5, 34. Rescap has also attached a list of allegedly fraudulent transfers that are dated and denote the recipients of money from FCMC. Ex. I to Compl.

Rescap has also established an immediate right of possession. Rescap alleges that on October 24, 2017, it filed a UCC statement, including dates, amounts, and receipts to perfect its security interest and place a lien on "[a]ll assets of [FCMC] . . . including . . . all Financial Assets [and] all cash or cash equivalents, all proceeds and products . . ." UCC Statement [Dkt. No. 17-4] 5 attached as Exhibit D to Compl. It has sufficiently alleged an immediate right to possession to allegedly fraudulent transferred monies after the date of the UCC statement's filing.

Defendants cite *Vu v. California Commerce Club, Inc.*, arguing that a generalized claim for money is not actionable as conversion. Reply 12-13 (citing 58 Cal. App. 4th 229, 235 (1997)). In *Vu*, the plaintiff did not plead nor identify with responsive proof any specific sums that the defendant took from them. *Id.* Unlike in *Vu*, Rescap has sufficiently pleaded the specific sums it claims have been converted.

Defendants also cite *Farmers Ins. Exchange v. Zerin* to argue a contractual right to payment of money is not sufficient to support conversion. Reply 13 (citing 53 Cal. App. 4'h 445,452 (1997)). However, the court in *Zerin* also stated that "[o]ne who wrongfully withholds personal property from another who is entitled to it under a security agreement may be liable for conversion." *Id.* at 452. (internal citations omitted). The *Zerin* court also cited *Weiss v. Marcus*, an on-point case, where the California Court of Appeal found the distribution of settlement funds subject to a lien to constitute conversion. *Id.* (citing 51 Cal. App. 3d 590, 599 (Ct. App. 1975)).

In *Weiss v. Marcus*, the plaintiff had hired an attorney to prosecute a matter, giving the

attorney an express lien on all amounts recovered to secure repayment of his fees. *Id.* Before the completion of the action, the client replaced the first attorney with a second attorney. *Id.* After achieving a settlement, the second attorney disbursed the entire amount to himself and the client, despite knowing of the first attorney's lien rights. *Id.* The first attorney sued both the client and the second attorney. *Id.* The California Court of Appeal concluded that the first attorney had stated a claim for conversion against the second attorney by virtue of the second attorney's exercise of dominion over that portion of the settlement proceeds covered by the first attorney's lien. *Id.* Just as the lien was sufficient to state a right for immediate possession and ultimately conversion in *Weiss*, the lien Rescap holds is sufficient to state a claim for conversion against FCMC.

Defendants argue for the first time in their reply that Section 9-312(b)(3) of the California Commercial Code "a security interest in money may be perfected only by the secured party's taking possession under Section 9-313." Reply 13. I will not consider this new argument raised in a reply brief. *See Rhinehart v. Cate*, No. C 11-0812 JSW PR, 2013 WL 322533, at *2 (N.D. Cal. Jan. 28, 2013) (citing *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir.2007)). Defendants may raise this issue again at an appropriate time in an appropriate manner later in the litigation.

Defendants' motion to dismiss the conversion claim is denied.

## CONCLUSION

Defendants' motion to dismiss is DENIED. They shall answer within fourteen days of the date of this Order.

**IT IS SO ORDERED.**

Dated: October 25, 2018

William H. Orrick
United States District Judge