1  FINESTONE HAYES LLP
   Jennifer C. Hayes (Bar No. 197252)
2  jhayes@fhlawllp.com
   456 Montgomery Street, 20th Floor
3  San Francisco, California 94104
   Telephone:    (415) 616-0466
4  Facsimile:    (415) 398-2820

5  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Anthony P. Alden (Bar No. 232220)
6  anthonyalden@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
7  Los Angeles, California  90017-2543
   Telephone:    (213) 443-3000
8  Facsimile:    (213) 443-3100

9  Attorneys for Plaintiff ResCap Liquidating Trust

10              UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13  RESCAP LIQUIDATING TRUST,          Case No. 3:18-cv-03283-WHO

14            Plaintiff,               **FIRST AMENDED COMPLAINT FOR:
                                       (1) AVOIDANCE OF INTENTIONAL**
15       vs.                           **FRAUDULENT TRANSFERS; (2)
                                       AVOIDANCE OF CONSTRUCTIVELY**
16  FIRST CALIFORNIA MORTGAGE          **FRAUDULENT TRANSFERS; (3)**
    COMPANY; CHRISTOPHER HART,         **INTENTIONAL INTERFERENCE WITH**
17  INDIVIDUALLY AND AS TRUSTEE        **CONTRACT; (4) INTENTIONAL**
    OF THE CHRISTOPHER K. HART 1997    **INTERFERENCE WITH ECONOMIC**
18  REVOCABLE TRUST UAD 12/23/1997;    **ADVANTAGE; (5) NEGLIGENT**
    DENNIS HART, INDIVIDUALLY AND      **INTERFERENCE WITH ECONOMIC**
19  AS TRUSTEE OF THE HART FAMILY      **ADVANTAGE; (6) CONVERSION; (7)**
    1996 TRUST AUD 04/02/1996;         **BREACH OF FIDUCIARY DUTY; AND**
20  ELIZABETH HART-ARMSTRONG,          **(8) DECLARATORY RELIEF**
    INDIVIDUALLY AND AS TRUSTEE
21  OF THE ELIZABETH A. HART 1997      **DEMAND FOR JURY TRIAL**
    REVOCABLE TRUST UAD 10/15/1997;
22  DAVID ARMSTRONG; SEAGULL
    SERVICES, LLC; FIRST CALIFORNIA
23  LENDING SOLUTIONS; HART
    FAMILY FOUNDATION; D.M.H.
24  FAMILY LIMITED PARTNERSHIP; and
    TIVOLI ASSET MANAGEMENT, INC.,
25
           Defendants.
26

27

28

Plaintiff ResCap Liquidating Trust (the "Trust" or "Plaintiff") alleges:

## SUMMARY OF ACTION

1.     This action arises out of a scheme by the Individual Defendants[1] to induce Plaintiff to enter into a settlement agreement resolving Plaintiff's lawsuit against their company, First California Mortgage Company ("FCMC"), while stripping FCMC of its assets for the benefit of the Individual Defendants and their affiliated entities (*i.e.,* the Entity Defendants[2]), leaving FCMC an empty shell unable to satisfy its settlement obligations.  The Individual Defendants—members of the Hart family, who own FCMC and the affiliated Defendants—orchestrated the transfers of FCMC's assets leading up to and after having FCMC enter into the settlement agreement with Plaintiff, and then promptly shuttered FCMC's doors.  Plaintiff has now been left high and dry, while Defendants enrich themselves with FCMC's former assets.

2.     On December 13, 2013, Residential Funding Company, LLC ("RFC") filed a complaint against FCMC in the action styled, *Residential Funding Company, LLC v. First California Mortgage Company*, No. 13-CV-3453 (D. Minn.) (the "Litigation"), asserting claims for breach of contract and indemnification.  On September 23, 2016, RFC, the Trust, and FCMC entered into a Settlement and Release Agreement (the "Settlement Agreement"), pursuant to which FCMC agreed to pay $6 million to the Trust, under a payment schedule, to resolve the Litigation.  In the event FCMC defaulted under the payment schedule, FCMC was obligated to pay the Trust $7 million, less any payments already made.

3.     Unbeknownst to Plaintiff, while the Litigation was pending and even while negotiating the Settlement Agreement, the Individual Defendants were transferring FCMC's assets to themselves and entities they controlled (*i.e.,* the Entity Defendants and the Personal Trusts[3]).  When FCMC failed to make the fourth required settlement payment, Plaintiff sought entry of a

---

[1]   "Individual Defendants" means Christopher Hart, Dennis Hart, Elizabeth Hart-Armstrong and David Armstrong.

[2]   "Entity Defendants" means Seagull Services, LLC, First California Lending Solutions, Hart Family Foundation, D.M.H. Family Limited Partnership, and Tivoli Asset Management, Inc.

[3] "Personal Trusts" means The Christopher K. Hart 1997 Revocable Trust UAD 12/23/1997, The Hart Family 1996 Trust UAD 04/02/1996, and The Elizabeth A. Hart 1997 Revocable Trust UAD 10/15/1997.

confessed judgment, pursuant to the Settlement Agreement.  On July 24, 2017, the Sonoma County Superior Court entered judgment in Plaintiff's favor pursuant to a Confession of Judgment in the amount of $6,497,500, as well as statutory post-judgment interest until satisfied (the "Original Judgment").

4.      As part of the Hart family's scheme, FCMC requested that Plaintiff forbear on enforcing the Original Judgment, purportedly to allow them additional time to pay a lump-sum to Plaintiff from the proceeds of FCMC's allegedly imminent sale.  All the while, and unbeknownst to Plaintiff, the Hart family continued to pillage FCMC's assets.

5.      On August 4, 2017, the parties entered into an Amendment to Settlement and Release Agreement (the "Amended Settlement Agreement"), under which FCMC agreed to make a single, lump-sum payment to the Trust of $6,679,074 on November 3, 2017 (the "Balloon Payment").  The Amended Settlement Agreement also allowed RFC and the Trust to seek the entry of an Amended Judgment in the amount of $6,497,500, as well as statutory post-judgment interest until satisfied (the "Amended Judgment").  The Sonoma County Superior Court entered the Amended Judgment on September 20, 2017.

6.      Rather than make the required settlement payments as it was contractually obligated to do, from approximately June 2014 to at least March 2018, FCMC transferred at least $17 million to the Individual Defendants and entities they controlled.  FCMC transferred these funds under the pretext of paying purported salaries, notes, interest, loan fees, distributions, professional fees, and subleases.  In reality, these transfers were made to hinder, delay, or defraud FCMC's creditors and in violation of the Individual Defendants' fiduciary duties to FCMC's creditors.  FCMC did not receive reasonably equivalent value for these transfers, and it was insolvent at the time it made the transfers or was rendered insolvent as a result of them.

7.      Promptly after failing to make the Balloon Payment to Plaintiff in November 2017, and without so much as notifying Plaintiff, FCMC shut down its operations, surrendered all of its leaseholds, wiped certain of its computers, and told landlords they were free to salvage anything left at the premises.

8.      The fraudulent scheme of the Hart family and FCMC has left Plaintiff with an empty shell of a company from which to collect the Amended Judgment.  As a result of the actions of FCMC and its insiders, Plaintiff has suffered damages of no less than $6,679,074.  Plaintiff now seeks to recover those damages.

## PARTIES

9.      Plaintiff is an express Delaware statutory trust and is the successor-in-interest to certain rights of RFC, which filed for Chapter 11 bankruptcy in May 2012 and is no longer engaged in active business operations.  At the time RFC filed for bankruptcy, it was a wholly-owned subsidiary of GMAC-RFC Holding Company, LLC, which in turn was a wholly-owned subsidiary of Residential Capital, LLC.  Residential Capital, LLC was a wholly-owned subsidiary of GMAC Mortgage Group, LLC, which in turn was a wholly-owned subsidiary of Ally Financial, Inc.  On December 17, 2013, pursuant to the Second Amended Joint Chapter 11 Plan that resolved RFC's bankruptcy, GMAC Mortgage Group LLC's interest in RFC was cancelled and, in accordance with the Plan's terms, Plaintiff has now succeeded to RFC's rights and interests.

10.      Defendant FCMC is a closely-held California corporation with its former principal place of business at 1400 N. McDowell Blvd., Suite 300, Petaluma, CA 94954 ("McDowell Property").  At all relevant times, FCMC was in the business of originating and selling residential mortgage loans, including selling them to RFC.  FCMC is owned, managed, and controlled by members of the Hart family, including Defendants Dennis Hart, Christopher Hart, Elizabeth Hart-Armstrong, and David Armstrong, and is an affiliate of Defendants Seagull Services, LLC, First California Lending Solutions, Hart Family Foundation, D.M.H. Family Limited Partnership, Tivoli Asset Management, Inc., and the Personal Trusts.

11.      Defendant Dennis Hart is Defendants Christopher Hart's and Elizabeth Hart-Armstrong's father, and Defendant David Armstrong's father-in-law.  Defendant Dennis Hart is the founder, former Chief Executive Officer ("CEO") and President, and a current shareholder, director, and Chairman of Defendant FCMC.  Defendant Dennis Hart:  (i) has been a director and the Chairman of Defendant First California Lending Solutions from 2004 to the present, and was its President from 2010 to 2015; (ii) was a director of Defendant Tivoli Asset Management, Inc.

-4-

from 2007 through its dissolution in March 2015, and was its President from 2007 to 2010; (iii) has been a director of Defendant Hart Family Foundation from 1998 to the present, and has been its vice president and Chief Financial Officer ("CFO") from 2014 to the present; (iv) is Defendant Seagull Services, LLC's sole member; and (iv) is the general partner of Defendant D.M.H. Family Limited Partnership.  At all relevant times, Dennis Hart has been a citizen and resident of California.

12.     Plaintiff is informed and believes that the Hart Family 1996 Trust AUD 04/02/1996 is Defendant Dennis Hart's personal trust, which Dennis Hart controls, and of which he is a trustee and a beneficiary.

13.     Defendant Christopher Kamin Hart is Defendant Dennis Hart's son, Defendant Elizabeth Hart-Armstrong's brother, and Defendant David Armstrong's brother-in-law. Defendant Christopher Hart was a director of FCMC from 2002 to 2018, acted as Secretary and Vice Chairman from 2002-2015, took over as Defendant FCMC's CEO and President upon the elder Hart's retirement, and is an FCMC shareholder.  Defendant Christopher Hart:  (i) has been a director and shareholder of Defendant First California Lending Solutions from 2004 to the present, and has been its CEO from 2014 to the present; (ii) was Defendant Tivoli Asset Management, Inc.'s corporate Secretary from 2007 through 2011, its CEO and President from 2012 through 2013, and its director from 2007 through 2010, and again from 2012 through its dissolution in March 2015; and (iii) has been a director, Secretary, and Treasurer of Defendant Hart Family Foundation from 2018 to the present.  At all relevant times, Christopher Hart has been a citizen and resident of California.

14.     Plaintiff is informed and believes that the Christopher K. Hart 1997 Revocable Trust UAD 12/23/1997 is Defendant Christopher Hart's personal trust, which Christopher Hart controls and of which is he is a trustee and a beneficiary.

15.     Defendant Elizabeth Hart-Armstrong ("Hart-Armstrong") is Defendant Dennis Hart's daughter, Defendant Christopher Hart's sister, and Defendant David Armstrong's wife. Defendant Hart-Armstrong was a director and shareholder of Defendant FCMC from 2006 through 2018, and its corporate Secretary from 2012 through 2018.  Defendant Hart-Armstrong:

(i) has been a director of Defendant First California Lending Solutions from 2004 to the present, and has been its CFO and corporate Secretary from 2014 to the present; (ii) was a director of Tivoli Asset Management, Inc. from 2007 to 2010, and again from 2012 through its dissolution in March 2015; and (iii) has been a director of Defendant Hart Family Foundation from 1998 to the present, its President from 1998 to 2014, and its CEO from 2014 to the present.  At all relevant times, Hart-Armstrong has been a citizen and resident of California.

16.     Plaintiff is informed and believes that the Elizabeth A. Hart 1997 Revocable Trust UAD 10/15/1997 is Defendant Hart-Armstrong's personal trust, which Hart-Armstrong controls and of which she is a trustee and a beneficiary.

17.     Defendant David Armstrong is Defendant Hart-Armstrong's spouse, Defendant Christopher Hart's brother-in-law, and Defendant Dennis Hart's son-in-law.  Defendant David Armstrong was FCMC's Executive Director of Client Services and Broker of Record from August 2014 to September 2015, its Executive Vice President and Chief Operating Officer ("COO") from February 2017 to February 2018, and a shareholder from at least June 2014 to January 2018.  At all relevant times, David Armstrong has been a citizen and resident of California.

18.     Defendant Seagull Services, LLC ("Seagull") is a California limited liability company with its principal place of business at 1100 Larkspur Landing #290, Larkspur, CA 94939 ("Larkspur Property").  Defendant Seagull is owned by Defendant Dennis Hart, who is its sole member, and is an affiliate of Defendants FCMC, First California Lending Solutions, Hart Family Foundation, D.M.H. Family Limited Partnership, and Tivoli Asset Management, Inc.

19.     Defendant First California Lending Solutions ("FCLS") is a California corporation with its principal place of business at the Larkspur Property.  Defendant FCLS is owned by Defendants Christopher Hart, Dennis Hart, Hart-Armstrong, D. Michael Hart, Jr. and one other member of the Hart family.  From June 2014 to the present:  (i) Defendant Christopher Hart has been its CEO and a director; (ii) Defendant Dennis Hart has been a director; (iii) Defendant Hart-Armstrong has been its Secretary, CFO, and a director; and (iv) Ellen Greene, a former FCMC employee, has been its Treasurer.  Defendant FCLS is an affiliate of Defendants FCMC, Seagull, Hart Family Foundation, D.M.H. Family Limited Partnership, and Tivoli Asset Management, Inc.

20.     Defendant Hart Family Foundation ("HFF") is a California non-profit corporation with its principal place of business at the Larkspur Property.  Further:  (i) Defendant Hart-Armstrong was HFF's President and is its CEO, director, and agent for service of process; (ii) D. Michael Hart, Jr. is its Secretary; (iii) Defendant Dennis Hart is its CFO; (iv) Defendant Christopher Hart is its Treasurer; and (v) another Hart family member is its Chairwoman. Defendant HFF is an affiliate of Defendants FCMC, Seagull, FCLS, D.M.H. Family Limited Partnership, and Tivoli Asset Management, Inc.

21.     Defendant D.M.H. Family Limited Partnership ("DMHFLP") is a limited partnership incorporated in the State of Nevada.  Defendant Dennis Hart is DMHFLP's General Partner and Defendant DMHFLP is entirely controlled by him.

22.     Defendant Tivoli Asset Management, Inc. ("Tivoli") is a dissolved California corporation with its principal place of business at 750 Lindaro St, Ste. 240, San Rafael, CA 94901. Defendant Christopher Hart was Tivoli's CEO, director, and shareholder; Defendant Hart-Armstrong was Tivoli's Secretary, director, and shareholder; and Defendant Dennis Hart was a director and shareholder.

23.     The following chart illustrates each Individual Defendant's role at each Entity Defendant:

|  |  | Dennis Hart | Christopher Hart | Hart-Armstrong | David Armstrong |
|---|---|---|---|---|---|
| FCMC |  | Founder<br>Former CEO<br>Shareholder<br>Director<br>Chairman | Director<br>Shareholder<br>Former Secretary<br>Former Vice Chairman<br>CEO and President | Director<br>Shareholder<br>Former Corporate Secretary | Former Shareholder<br>Former Director<br>Former Broker of Record<br>Former Executive Vice President<br>Former COO |
| Seagull |  | Sole Member |  |  |  |
| FCLS |  | Director<br>Chairman | Director<br>Shareholder<br>CEO | Director<br>CFO |  |

|  |  | Dennis Hart | Christopher Hart | Hart-Armstrong | David Armstrong |
|---|---|---|---|---|---|
|  |  | Former President |  | Corporate Secretary |  |
|  | **HFF** | Director<br><br>Vice President<br><br>CFO | Director<br><br>Secretary<br><br>Treasurer | Director<br><br>CEO<br><br>Former President |  |
|  | **DMHFLP** | General Partner |  |  |  |
|  | **Tivoli** | Director until dissolution<br><br>Former President | Director through dissolution<br><br>Former CEO and President<br><br>Former Corporate Secretary | Director |  |

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the claims presented in this Amended Complaint under 28 U.S.C. § 1334(b) because the claims presented in this Amended Complaint are related to a pending case under Title 11 of the United States Code styled, *In re Residential Capital, LLC, et al.*, Case No. 12-12020 (MG).

25.     Personal jurisdiction and venue are proper in this District pursuant to 28 U.S.C. § 1391 because (a) Defendants' residences and principal places of business are located in the Counties of Marin and Sonoma, State of California, and (b) a substantial part of the events or omissions giving rise to the claims occurred in the Counties of Marin and Sonoma, State of California.

26.     "Intradistrict Assignment."  Assignment to the San Francisco Division is proper pursuant to Local Rules 3-2(c) and (d), because a substantial part of the events or omissions which give rise to the claim occurred in the Counties of Marin and Sonoma, State of California.

## BACKGROUND FACTS

**A.     RFC's Business and Bankruptcy**

27.     At all relevant times prior to its bankruptcy in May 2012, RFC was in the business

of acquiring residential mortgage loans from mortgage originators and selling them into residential mortgage-backed securitization ("RMBS") trusts[4] or to whole loan purchasers.

28.     Critical to RFC's business success was the quality of the loans it purchased from mortgage originators such as FCMC.  To that end, RFC typically required its correspondent lenders, including FCMC, to abide by a Client Contract and Client Guide.  These documents set out stringent loan-level contractual representations and warranties made by the correspondent lender, which were designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans RFC purchased.

29.     Over the course of the parties' relationship, RFC acquired over 300 residential mortgage loans from Defendant FCMC, with an original principal balance of over $125 million, pursuant to several Client Contracts and the Client Guide.  RFC placed over 300 of these loans into RMBS trusts, which issued certificates to investors.

30.     Due in significant part to the failure of correspondent lenders, including FCMC, to honor their contractual representations and warranties concerning the loans RFC bought from them, RFC was sued by numerous counterparties and investors in its RMBS.  In May 2012, in the face of these mounting lawsuits, RFC was forced to file a Chapter 11 bankruptcy petition, which case is one of the jointly administered Chapter 11 cases pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under the caption, *In re Residential Capital, LLC, et al.*, Case No. 12-12020 (MG).

31.     On December 11, 2013, the Bankruptcy Court approved a global settlement of RFC's RMBS-related liabilities for over $10 billion in allowed claims, and confirmed the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital LLC, *et al.* and the Official Committee of Unsecured Creditors, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan").  Pursuant to the Plan, the Trust succeeded to certain of RFC's rights and is

---

[4]   RMBS trusts are trusts that hold residential mortgages and issue certificates to investors for which the mortgages constitute collateral.  Investors are paid by receiving a share of the payments of principal and interest made by the borrowers on the mortgage loans.

1    responsible for monetizing many of the Debtors' remaining assets and pursuing litigation claims,

2    including RFC's rights against FCMC and other parties who sold mortgages to RFC.  The

3    proceeds recovered by the Trust are distributed to the Debtors' creditors after the payment of costs

4    and expenses.

5           **B.     RFC's Complaint Against FCMC, the Settlement, and the Judgment**

6           32.     On December 13, 2013, RFC filed a complaint against FCMC in the U.S. District

7    Court for the District of Minnesota (the "District Court") in an action styled, *Residential Funding*

8    *Company, LLC v. First California Mortgage Company*, No. 13-CV-3453 (D. Minn.).  RFC

9    asserted claims for breach of contract and indemnification under the Client Contracts and Client

10   Guide arising from FCMC's sale of defective residential mortgage loans to RFC, which RFC then

11   placed into RMBS trusts.

12          33.     On September 23, 2016, after nearly three years of litigation, the parties entered

13   into the Settlement Agreement.  Under the Settlement Agreement, FCMC agreed to pay $6 million

14   to the Trust to resolve the Litigation, with the settlement amount to be paid in installments

15   pursuant to a payment schedule.  The payment schedule required FCMC to make installment

16   payments starting October 10, 2016, through September 10, 2020, with the payments increasing

17   over time.  In the event FCMC defaulted under the payment schedule, FCMC was obligated to pay

18   the Trust $7 million less than any payments already made.  The Settlement Agreement is attached

19   as **Exhibit A**.

20          34.     As the shareholders, directors, and officers of closely-held FCMC, each Individual

21   Defendant considered and approved the Settlement Agreement.  Defendant Christopher Hart

22   signed the Settlement Agreement as FCMC's President and CEO.  Christopher Hart and FCMC's

23   counsel also signed Affidavits of Confession of Judgment in the event FCMC defaulted on its

24   payment obligations.

25          35.     FCMC made the first required payment under the Settlement Agreement of

26   $83,750, the second required payment of $167,500, and the third required payment of $251,250.

27   However, FCMC failed to make the fourth requirement payment of $251,250 as provided in

28   Section 2(a) of the Settlement Agreement, and made no further payments.  RFC and the Trust sent

-10-

1   a Notice of Default to FCMC as required by the Settlement Agreement, but FCMC did not cure

2   the default.

3       36.     Accordingly, on July 21, 2017, RFC and the Trust properly filed the Affidavits and

4   Declarations of Confession of Judgment, along with an affidavit by the Trust's CFO, and sought

5   entry of a confessed judgment.  On July 24, 2017, the Sonoma County Superior Court entered

6   judgment against FCMC and in favor of Plaintiff in the amount of $6,497,500, plus statutory post-

7   judgment interest until satisfaction.  The Original Judgment is attached as **Exhibit B**.

8       37.     After entry of the Original Judgment, FCMC contacted Plaintiff and represented

9   that it was negotiating its sale and would pay the total amount owing under the Settlement

10  Agreement out of the sale proceeds, which would be sufficient to pay Plaintiff and FCMC's other

11  creditors in full.  FCMC requested that Plaintiff forbear on enforcing the Original Judgment to

12  allow FCMC additional time to pay Plaintiff a lump sum out of the proceeds of its sale.

13      38.     On August 4, 2017, and in reliance on FCMC's representations, RFC, the Trust,

14  and FCMC entered into the Amended Settlement Agreement, which was approved by each

15  Individual Defendant and signed by Defendant Christopher Hart on FCMC's behalf.  Pursuant to

16  that Amended Agreement, FCMC agreed to make a single Balloon Payment to the Trust of

17  $6,679,074 on November 3, 2017.  FCMC's obligation to make the Balloon Payment was

18  unconditional and was not contingent on its sale or any other events.  The Amended Settlement

19  Agreement is attached as **Exhibit C**.

20      39.     In order to induce Plaintiff to enter into the Amended Settlement Agreement,

21  FCMC agreed to a number of provisions designed to protect Plaintiff's rights.

22      40.     First, in Section 2 of the Amended Settlement Agreement, FCMC specifically

23  agreed that:

24          Until such time as First California pays the Balloon Payment in full to the
            Liquidating Trust, First California shall not sell, transfer, assign, encumber,
25          or dispose of any of its assets other than in the ordinary course of its business
            for fair consideration, without the RFC Parties' prior written consent. Assets
26          sold in the ordinary course of business shall be limited to loans originated
            and re-sold whereby the proceeds are utilized to pay warehouse loans. In no
27          event shall First California transfer, assign, encumber, or dispose of any of
            its assets, or make payments of any kind (including dividends) to any of its
28          affiliates or shareholders, owners, directors, officers, employees, or any of

their family members or affiliates, other than reportable wages paid in amounts consistent with past practice. Further, First California shall not make any payments to creditors which would constitute a preference under Section 547 of the Bankruptcy Code.

41.   *Second*, in Section 3 of the Amended Settlement Agreement, FCMC granted Plaintiff a security interest in and to the proceeds of FCMC's sale, or the sale of any of its assets other than in the ordinary course of its business for fair consideration, up to the amount of the Balloon Payment.  On October 24, 2017, Plaintiff perfected its security interest by filing a Uniform Commercial Code financing statement with respect to the following assets:

All assets of FIRST CALIFORNIA MORTGAGE COMPANY, whether now owned or existing, or hereafter acquired or arising, and wherever located, including, without limitations, all of the following assets, properties and interest in property of FIRST CALIFORNIA MORTGAGE COMPANY: all Accounts, all Equipment, all Commercial Tort Claims, all General Intangibles, all Chattel paper, all inventory, all Negotiable Collateral, all Investment Property, all Financial Assets, all Letter of Credit Rights, all Supporting Obligations, all Deposit Accounts, all cash or cash equivalents, all proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all tangible or intangible property resulting from the sale, lease, license or other disposition of the foregoing, or any portion thereof or interest therein, and all proceeds thereof.  Notwithstanding anything to the contrary contained in this definition, the term "Collateral" shall not include any rights or interest in any assets of FIRST CALIFORNIA MORTGAGE COMPANY sold in the ordinary course of business (defined as loans originated and re-sold whereby the proceeds are utilized to pay warehouse loans), or any rights or interest in any contract or lease covering equipment or fixtures of FIRST CALIFORNIA MORTGAGE COMPANY if under the terms of such contract or lease, or applicable law with respect thereto, the valid grant of a security interest or lien therein to the ResCap Liquidating trust and/or Residential Funding Company, LLC is prohibited as a matter of law or under the terms of such contract or lease.

The UCC financing statement is attached as **Exhibit D**.

42.   *Third*, Section 4 of the Amended Settlement Agreement specifically provided that proceeds of the sale of FCMC or any of its assets (other than assets sold in the ordinary course of its business for fair consideration) would be held by a third-party escrow company in trust for the benefit of Plaintiff.  Section 4 further provided that no proceeds from FCMC's sale or the sale of any its assets (other than assets sold in the ordinary course of its business for fair consideration)

-12-

"may be paid to First California, its shareholders, owners, directors, officers, employees, or any other person, until such time as the Balloon Payment has been paid in full."  The escrow instructions agreed upon by the parties are attached as **Exhibit E**.

43.     Fourth, FCMC agreed that Plaintiff could immediately file the Amended Judgment to correct several clerical errors in the Original Judgment, and could thereafter record an Abstract of the Amended Judgment and a Notice of Judgment.  On September 20, 2017, the Court entered the Amended Judgment against FCMC and in favor of Plaintiff in the amount of $6,497,500, plus statutory post-judgment interest until satisfaction.  The Amended Judgment is attached as **Exhibit F**.  Pursuant to Section 7 of the Amended Settlement Agreement, Plaintiff agreed not to enforce the Amended Judgment unless and until FCMC failed to make the Balloon Payment on November 3, 2017.

44.     On September 29, 2017, an Abstract of Judgment was recorded in the Official Records of Sonoma County and a Notice of Judgment Lien was filed with the California Secretary of State.  These are attached as **Exhibits G and H**, respectively.

45.     FCMC did not make the Balloon Payment on November 3, 2017.  To date, FCMC has not made any further payments on account of the settlement or the Amended Judgment.

**C.       The Fraudulent Transfers and Shut Down of FCMC**

46.     Rather than make good on its contractual obligations, Plaintiff is informed and believes that, from June 2014 through at least March 2018, FCMC transferred at least $17 million to the Individual Defendants and various entities they controlled, including Defendants Seagull, FCLS, HFF, DMHFLP, Tivoli, and the Personal Trusts.

47.     FCMC transferred the monies under the pretext of paying salaries, notes, interest, loan fees, distributions, professional fees, and subleases (the "Transfers").  In reality, the Transfers were made to hinder, delay, or defraud FCMC's creditors and involved improper self-dealing and preferential payments to insiders.

48.     The amounts, dates, and parties to the Transfers are identified in the attached **Exhibit I**,[5] which reflects information provided to Plaintiff by Defendants and various banks in connection with attempting to enforce the Amended Judgment and in this action.  Just a few of the numerous fraudulent transfers received by the Defendants from FCMC include:

- From June 2014 to December 2018, FCMC paid FCLS over $550,000 for purported "consulting fees," even though it permitted FCLS to determine its own "compensation," and despite the fact that it was also paying Seagull for allegedly providing *exactly the same* services.

- On August 19, 2015, while the Litigation was pending, FCMC paid $250,000 to Hart-Armstrong, allegedly to pay down a purported note dated July 11, 2012.  Yet, Defendants have failed to produce such a note and Plaintiff is informed and believes that there is no such note.

- On April 5, 2017, just two months before it defaulted under the Amended Settlement Agreement, FCMC paid Defendant Dennis Hart $1,650,000.  Although Dennis Hart has claimed that this was a loan repayment, FCMC has stated the "loan" was in fact a capital contribution, making the repayment voidable.

- On December 27, 2017, after it had purportedly shut down operations, FCMC paid Christopher Hart $26,000.

- In 2017 and 2018, FCMC paid David Armstrong over $92,000 in "salary" because he was a family member, even though he brought no value to the company. Christopher Hart testified that he "couldn't give him a task to do."

49.     Plaintiff is informed and believes that the Transfers were made as part of a scheme to hinder, delay, and defraud FCMC's creditors, including Plaintiff, its warehouse lenders, and the United States Department of Housing and Urban Development ("HUD").  One component of the

---

[5]  Exhibit I is not intended to include all possible transfers to Defendants.  For example, Plaintiff believes that FCMC paid additional amounts to Defendants in 2016 and 2017 but cannot currently determine the specific dates of those payments and whether those payments include the specific amounts listed in Exhibit I.  Plaintiff reserves the right to amend Exhibit I and to prove additional fraudulent transfers not identified on Exhibit I.

scheme involved FCMC's insiders making repeated "short term loans" to FCMC over many years to meet liquidity and net worth requirements at or around reporting periods and then quickly repaying themselves once the reporting period had passed.  In this way, Defendants fooled HUD and FCMC's creditors, including their warehouse lenders, into believing FCMC had the required minimum net worth and liquidity, while making sure that FCMC kept lining the pockets of its insiders.  Indeed, FCMC has stated that many of the ostensible "loans" were made for the purpose of meeting "HUD covenant requirements."

50.     In most (if not all) cases, the "loans" by Defendants to FCMC were not negotiated, were not approved by independent directors or committees, or the corresponding notes are not signed.  FCMC purported to "repay" the loans to the insiders either within days or it waited years after their ostensible due dates.  The reason for these conspicuous irregularities is straightforward: they were not really loans at all, but actually capital contributions to ensure FCMC had just enough money to stay afloat, but never enough to pay its creditors.  In fact, FCMC has admitted that several of these "loans" were capital contributions.  Because many of the Transfers were not in fact loan repayments, but improper distributions of capital, they were not for reasonably equivalent value and are voidable.  And even if these payments were on account of legitimate loans (they were not), they constitute self-dealing transactions and preferential payments to insider creditors.

51.     Many of the other Transfers are allegedly based on paying salaries, consulting services, or other "agreements."  But discovery has revealed that these reasons were mere pretexts, and that the real reason for the Transfers was to enrich the Hart family.

52.     For example, although many of the Transfers to David Armstrong were on account of purported salary, FCMC has admitted that the only reason it paid David Armstrong was because he was a family member, and that he brought no value to the company.  As FCMC's designated representative, Defendant Christopher Hart testified under oath:  "Um, David's my brother-in-law, so I love him.  He – I mean, you got to give him --- I mean, so what did he do? He didn't have any real day-to-day control.  He has ideas about doing things and he'd voice his ideas, but would I give him a task to do? I couldn't give him a task to do."

53.     Likewise, FCMC paid over $8 million to its affiliate and Dennis Hart-controlled Defendant Seagull from June 2014 to November 2017 for (a) purported "consulting services," (b) a letter of credit, and (c) allowing FCMC to use "Deal Works," a software program that FCMC itself had purportedly developed and then sold to Seagull in 2009. Each of these were shams. The only purported consulting services provided to FCMC by Seagull were through Defendant Dennis Hart, who was already a director, shareholder, and officer of FCMC. Moreover, Seagull incurred no costs to purportedly provide these "consulting services" and their ostensible value came nowhere close to what Seagull was paid for them. And even though Seagull apparently "waived" its fees in 2016, they were actually "converted" to a loan and therefore FCMC did not record those fees as payments for services. In short, the "consulting fees" paid by FCMC to Seagull were simply a way to siphon money from FCMC to its sole owner, Dennis Hart.

54.     The same is true with respect to FCMC's letter of credit to Seagull and the agreement whereby Seagull acquired Deal Works and then licensed it back to FCMC in exchange for a per-loan fee. As discussed above, the funds advanced by Seagull to FCMC under the letter of credit were actually capital contributions designed to meet minimum financial requirements imposed by both HUD and warehouse lenders. And, although FCMC purportedly sold Deal Works to Seagull in 2009, FCMC purportedly continued to pay for its development; FCMC's insurance policies from 2012-2017 name "First California Mortgage dba Deal Works" as an additional insured; and FCMC continued to be the registered owner of the "Deal Works" trademark with the United States Patent and Trademark Office ("USPTO"). As with the "consulting fees," the sale of Deal Works from FCMC to Seagull was simply a sham designed to funnel money from FCMC to Dennis Hart via Seagull—this time in the form of "licensing fees."

55.     Similarly, FCMC paid nearly $560,000 in alleged "consulting fees" to FCLS during the relevant period. However, Defendants have admitted that the only purported consulting services provided to FCMC by FCLS were through (a) Defendants Dennis Hart, Christopher Hart, and Hart-Armstrong, who were already shareholders, officers, and directors of FCMC, and (b) Ellen Greene, who was already an FCMC employee. Moreover, the services purportedly provided by FCLS just happened to be *exactly the same* services as provided by Seagull:  "legal, human

1   resources, accounting/tax and government, including advice regarding company stock option

2   plans, employee relations matters, and contract negotiations, human resources services,

3   governance consulting and provision of supplemental accounting staff." And in a particularly

4   telling accommodation, FCMC agreed that FCLS could unilaterally determine its own

5   compensation. As with Defendant Seagull, the consulting fees charged by FCLS were merely a

6   scam to funnel money out of FCMC to the Hart family.

7        56.     Similarly, FCMC paid over $420,000 to HFF under the guise of "Participation

8   Agreements." But these "Participation Agreements" were actually capital contributions by the

9   Hart family funneled through their corporate shells. Not only were these "Participation

10   Agreements" not signed by HFF, but HFF's board of directors did not approve these agreements

11   as it was required to under its own bylaws—the Agreements were not approved by disinterested

12   directors. Additionally, FCMC paid over $84,000 to HFF pursuant to an alleged sublease.

13   Plaintiff is informed and believes that this purported sublease is a sham intended to siphon money

14   out of FCMC and to the Hart family. Not only have Defendants failed to produce the master

15   lease, but: (a) HFF's only employee is Hart-Armstrong; (b) HFF has no operations; (c) HFF's

16   entity address is different than the address on the sublease; and (c) HFF paid $127,000 in director

17   salaries and purported professional fees from January 2014 through December 2017, while

18   receiving only $1,998 and making only $63,000 in alleged charitable donations. There is no

19   explanation why a charitable organization would rent and sublease a space that it is not using,

20   other than to enrich the Hart family at the expense of FCMC's legitimate creditors.

21        57.     Defendants' fraudulent transfers came to light only shortly before Plaintiff filed its

22   complaint in this action. Plaintiff sought to enforce the Amended Judgment, by, among other

23   things, serving a subpoena on FCMC in connection with the Amended Judgment. In response to

24   the subpoena, on March 6, 2018, FCMC's counsel informed Plaintiff for the first time that—

25   despite its outstanding contractual obligation to pay Plaintiff over $6 million—FCMC had ceased

26   operations and was in the wind down process.

27        58.     When Plaintiff's counsel asked when FCMC ceased operations, counsel for FCMC

28   responded that he was "not aware of the exact protocols", but he believed "the out of state

-17-

operations were shut down first."  Plaintiff's counsel again asked when the shutdown occurred, but counsel for FCMC responded that he "can't give exact dates for all locations"; loan originations "ceased sometime in February of this year"; and that "[p]rior to that date, [he] believe[d] that some or all of the out of state locations ceased business."  FCMC's counsel later responded that he had been "advised" that FCMC took its last mortgage application on November 30, 2017; FCMC's last loans were funded on December 29, 2017; all sales and operations staff, along with some IT, compliance, legal, administrative, and marketing staff had been released; and loans were "cleared off" of FCMC's last warehouse facility in January 2018.

59.     On or about March 7, 2018, Plaintiff's counsel again spoke to FCMC's counsel, who informed Plaintiff's counsel that (unbeknownst to Plaintiff) he had been representing FCMC for over a year as bankruptcy counsel and that there were no FCMC assets left to pay the Amended Judgment.  Counsel stated that, when certain lenders learned about the Amended Judgment, they no longer wanted to lend to FCMC, and that FCMC allegedly was unable to sell its business due to the Amended Judgment.  Counsel further stated that FCMC shut down substantially all operations by December 31, 2017, and "certainly" shut down all out-of-state operations by that time.  FCMC purportedly surrendered its leaseholds by mid-January 2018, wiped all its computers remotely, and told the landlords they were free to salvage anything left at the premises.  According to its counsel, FCMC had no assets other than a claim for a refund of a security deposit on a bond, which the bonding company indicated it would keep for another year to see if any claims are brought against the bond.

60.     Contrary to Section 2 of the Amended Settlement Agreement, FCMC never sought Plaintiffs' consent prior to disposing its assets in the course of shutting down its operations, and never placed the proceed from such dispositions in escrow for Plaintiff's benefit.

61.     Defendants acted with malice, oppression, or fraud in stripping FCMC of its assets for the benefit of the Defendants, leaving FCMC an empty shell unable to satisfy its settlement obligations.

FIRST AMENDED COMPLAINT

**D.      FCMC Was Insolvent Or Undercapitalized At All Relevant Times**

62.      At the times FCMC made the Transfers to Defendants—including each Transfer in Exhibit I—FCMC was insolvent or undercapitalized.  This was, in part, as a result of FCMC's enormous liability to RFC in the Minnesota Litigation and the amounts it owed under the Settlement Agreement and Amended Settlement Agreement.

63.      As discussed above, over the course of their relationship, FCMC sold over 300 mortgage loans to RFC, with an original principal balance in excess of $125 million.  In its first amended complaint in the Minnesota Litigation, FCMC alleged that FCMC had breached multiple representations and warranties.  For example, FCMC had overrepresented property values by more than 10%, overrepresented property values by more than 15%, and failed owner-occupancy tests.  Many of the loans defaulted or became seriously delinquent, and sustained substantial losses, which exposed RFC to claims from investors, monoline insurers, and others.  Additionally, under the Client Contract and Client Guide, FCMC had agreed to indemnify RFC for these liabilities, losses and damages, and the attorneys' fees and costs that RFC incurred in defending itself against investors and monoline insurers.

64.      In addition, the Client Contract and Client Guide also provided that, in the event RFC prevailed against FCMC in the Minnesota Litigation, it could recover the attorneys' fees and costs incurred in prosecuting the claims.  And under applicable law, RFC was entitled to recover pre-judgment interest.  In fact, in a related case, the Trust obtained not only a jury verdict against the defendant lender but also pre-judgment interest, and is awaiting the court's ruling on its application for attorneys' fees and expenses.

65.      As noted above, Plaintiff and FCMC settled the Litigation in September 2016 for $6 million.  Under the Amended Settlement Agreement, FCMC agreed to pay Plaintiff a lump sum of $6,679,074.  But FCMC did not account for these liabilities to RFC in its financial statements.  FCMC's 2017 tax return shows a net loss of over $9 million without accounting for the sums owed to the Plaintiff.  FCMC's 2015 and 2016 audited financial statements fail to reflect a $6 million liability under the Settlement Agreement, yet still show a net loss of $4.1 million in 2016 and $675,411 in 2015..  Had the $6 million settlement been booked, adjusted equity for balance

sheet solvency would be approximately *negative* $1.8 million in 2016, and would have only been about $100,000 in 2015.  And FCMC's 2014 tax return shows "Ordinary business income" of *negative* $712,116, and an "Income/loss reconciliation" of *negative* $659,678.

> **E.    The Individual Defendants Operated FCMC and the Entity Defendants as a Single Enterprise Designed to Siphon Money from FCMC to Themselves**

66.    The Individual Defendants purposely used FCMC and the Entity Defendants for a single business purpose—to funnel money from FCMC to themselves, while ensuring that FCMC would never have sufficient funds to pay its creditors, including Plaintiff.

67.    The first prong of the Hart family's scheme was to ensure that FCMC (the only operating company in the Hart scheme) was consistently undercapitalized, so that all assets would stay out of the reach of FCMC's creditors.  That is the exact reason why the Defendants were routinely required to make purported short-term "operating loans" to FCMC—to ensure that FCMC would barely meet liquidity and net worth financial covenants required by its warehouse lenders and by HUD, without leaving any additional assets vulnerable to claims by creditors.  The Hart family caused FCMC to fail to record its liability to Plaintiff in its financial statements for the same reason—to deceive its warehouse lenders and HUD into thinking FCMC satisfied net worth financial covenants.  This allowed FCMC to keep operating and the Individual Defendants to keep enriching themselves, while ensuring creditors would be left "holding the can" if FCMC ever shut down.

68.    The second prong of the Individual Defendants' scheme was to arrange for several affiliated entities—the Entity Defendants—to enter into sham agreements with FCMC that would require FCMC to funnel funds to them under the guise of loan repayments, consulting fees, and license fees.  The entities had no meaningful operations, were controlled by the Individual Defendants, and were designed solely as conduits between FCMC and the Individual Defendants.

69.    For example, the vast majority of Seagull's income was "consulting fees" and "licensing fees" paid by FCMC, whereas Seagull spent considerable amounts related to Dennis Hart's private seaplane and its hanger.  Similarly, the vast majority of FCLS' income was based on transfers from FCMC, and the vast majority of its expenses were for paying salaries—the bulk

1    of which went to members of the Hart family.  Indeed, FCLS' only employees were members of

2    the Hart family, and for brief periods of time, three other individuals, two of which were employed

3    by FCMC.  Tivoli and DMHFLP never carried liabilities.  DMHFLP's only significant expense

4    was to pay $90,000 in 2017 for "consulting" to Dennis Hart.  And despite HFF's designation as a

5    "charitable" organization, it paid nearly $127,000 in director salaries and purported professional

6    fees from January 2014 through December 2017, while receiving only $1,998 and making only

7    $63,000 in ostensible charitable donations.

8         70.    The Individual Defendants directed these sham entities to enter into multiple non-

9    arms'-length agreements designed to transfer money from FCMC to the Harts.  A few particularly

10   notable examples include:

11        •    Defendants Dennis Hart, Christopher Hart, and Hart-Armstrong authorized and

12             directed FCMC to enter into a number of "notes" with themselves, when in reality,

13             they were merely providing FCMC the capital or liquidity it desperately needed.

14             As one illustration, FCMC and Hart-Armstrong entered into a note on October 14,

15             2014, which was signed by Hart-Armstrong for herself and by her brother

16             Christopher Hart on behalf of FCMC.  Similarly, FCMC and Dennis Hart entered

17             into a note on April 21, 2015, which was signed by Dennis Hart, and which was not

18             signed, but was supposed be signed, by his son Christopher Hart on behalf of

19             FCMC.

20        •    Defendants Dennis Hart, Christopher Hart, and Hart-Armstrong authorized FCMC

21             to enter into a "Revolving Line of Credit Agreement," "Consulting Services

22             Agreement," "Purchase and Sale Agreement," and several "Investment

23             Agreement[s]" with Defendant Seagull, as well as several amendments to these

24             agreements, even though Seagull is entirely owned and controlled by FCMC's

25             then-Chairman Dennis Hart and the agreements were designed solely to benefit

26             him.

27        •    Defendants Dennis Hart, Christopher Hart, and Hart-Armstrong authorized FCMC

28             to enter into a "Consulting Services Agreement" with FCLS, even though both

FIRST AMENDED COMPLAINT

FCMC and FCLS are owned and controlled by the Hart family, and any money paid by FCMC to FCLS would ultimately flow to them.  In fact, Defendants Dennis Hart, Christopher Hart, and Hart-Armstrong forced FCMC to agree that FCLS, an entity controlled by them, could *unilaterally* decide its own fees.

- Defendants Dennis Hart, Christopher Hart, and Hart-Armstrong authorized FCMC to enter into a "Revolving Letter of Credit Agreement" and "Consulting Services Agreement," with Tivoli, even though both FCMC and Tivoli are owned and controlled by the Hart family and any money paid by FCMC to Tivoli would ultimately flow to them.

- Defendants Dennis Hart, Christopher Hart, and Hart-Armstrong authorized FCMC to enter into several promissory notes with DMHFLP, even though DMHFLP is entirely controlled by Dennis Hart and the notes were designed to benefit him.

- Defendant HFF's bylaws require a majority of HFF's disinterested directors to approve transactions involving self-dealing.  Yet, even though HFF had no disinterested directors, it purportedly entered into a sublease and several "Participation Agreements" with FCMC whereby the monies paid by FCMC would ultimately benefit the Harts.

71.     These transactions demonstrate how the Individual Defendants used a series of wholly-owned and closely-controlled shell entities and interlocking agreements for the single common purpose of diverting FCMC's assets and funds to themselves.

72.     That FCMC and the Entity Defendants were operated as a single enterprise designed to enrich the Hart family at FCMC's expense is also evidenced by the routine commingling of assets.  For example, although FCMC paid Seagull "licensing fees" for using Deal Works, FCMC retained effective ownership over Deal Works after the alleged sale.  Among other things:  (a) FCMC's insurance policies from 2012-2017 name "First California Mortgage dba Deal Works" as an additional insured, even though FCMC ostensibly sold Deal Works to Seagull in 2009; (b) FCMC advertised itself as the owner of Deal Works; and (c) FCMC continued to be the registered owner of the "Deal Works" trademark with the USPTO.

73.     In February 2014, Seagull paid Individual Defendant David Armstrong $14,000 to purportedly resolve a commission dispute related to a loan originated by FCMC while David Armstrong was employed by FCMC.  Later, Seagull also paid David Armstrong $20,000 in connection with a refinance loan given by Bank of the Sierra, which Plaintiff is informed and believes was also related to a loan originated by FCMC.

74.     FCMC also repeatedly used litigation as an opportunity to funnel money to Seagull. For example, FCMC retained Miller Starr Regalia to represent it in a lawsuit, but entered into an agreement whereby Seagull would advance all attorneys' fees and costs in exchange for full reimbursement *and 50% of any recovery*.  Likewise, FCMC retained the law firm Covington & Burling to represent it in another lawsuit, but entered into an agreement whereby Seagull would fund the litigation while receiving a full reimbursement *and 50% of the recovery*.  In September 2014, Seagull paid $75,000 to DMHFLP, which DMHFLP then used to pay Covington & Burling. Nevertheless, FCMC has identified Covington & Burling as a creditor.  It is clear that the purpose of these arrangements was to pass along 50% of any recovery in the litigations to Seagull, while FCMC would effectively be saddled with all the costs.

75.     The Hart family's commingling of assets (and the sham nature of the transactions) may be best exemplified by payments to the "wrong" entity.  For example, FCMC produced a spreadsheet indicating that Defendant Hart-Armstrong loaned FCMC $200,000 on September 14, 2012 and $50,000 on September 27, 2012 (but no corresponding note has been produced).  The same spreadsheet indicates that both loans were paid back in full on October 1, 2012 with a single payment of $250,000.  But FCMC's bank statements reveal that FCMC did not pay Hart-Armstrong $250,000 on that date, rather FCMC paid Tivoli the $250,000.

76.     FCMC and the Entity Defendants also shared corporate offices.  FCMC operated at the McDowell Address, while each of DMHFLP, Seagull, HFF, and FCLS operated at the Larkspur Address.  But both Seagull's and Tivoli's corporate filings provide the McDowell address for service of process.  Moreover, FCMC transferred computer servers and other assets to the Larkspur Address as part of winding down.  And, although HFF had no active operations or

customers, it "subleased" property to FCLS and the McDowell Property to FCMC.  The purpose was to siphon funds out of FCMC, which had creditors, to HFF, which had no creditors.

77.     FCMC and the Entity Defendants also shared employees, attorneys, and accountants with no effective distinction made between the companies.  The purpose was to have these employees serve the Hart family, but to have FCMC pay for them.  For example:

- **All Defendants** – Defendants Dennis Hart, Christopher Hart, and Tivoli used Novogradac & Company LLP as their accountant in 2014 and 2015, and used Richey May & Co as their accountant from 2016 to 2018.  Seagull did not use an accountant because it was a single member LLC controlled by Dennis Hart.  All of the remaining Defendants used Richey May & Co. as their accountant from 2014 to 2018.

- **Individual Defendants** - The bank statements of Christopher Hart, Hart-Armstrong, and David Armstrong are addressed to Ellen Greene of FCLS (who was employed by FCMC).  One of Dennis Hart's bank statements include the hand-written words "Ellen" and "Change to Larkspur" in handwriting, which likely refer to the Larkspur Property, the location of many of the Entity Defendants.  And Ellen Greene, Marjan LaRue, and Susan Hoff (all FCMC employees) would routinely send emails on behalf of Dennis Hart, Christopher Hart, and Hart-Armstrong to their banks, asking that certain wires be made out of and/or into their personal accounts.

- **FCMC** - FCMC retained the law firm Covington & Burling to represent it in a lawsuit.  But DMHFLP paid Covington & Burling's fees, including a $75,000 payment in September 2014.  Seagull initially paid the $75,000 to DMHFLP, which DMHFLP then paid to Covington & Burling.  FCMC agreed to "reimburse" Seagull all of its expenses, and to give it 50% of its recovery.  But FCMC has identified Covington & Burling as a creditor.  Thus, it is clear that the purpose of this arrangement was to pass along the recovery to Seagull, while FCMC would be left on the hook for paying Covington & Burling.

FIRST AMENDED COMPLAINT

- **Seagull** - Susan Hoff signed Seagull's California Secretary of State filings as an "Executive Assistant," even though she was employed by FCMC.  Sally Fryer, who was FCMC's General Counsel, was the agent for service of process for both FCMC and Seagull.  Many of Seagull's corporate documents are signed by Ellen Greene, an FCMC employee who would also instruct banks to transfer monies from the Individual Defendants' and Entity Defendants' bank accounts to FCMC while using a Tivoli email address and an FCLS email signature.

- **FCLS** - For a time, Ralph Hints was Defendant FCLS' CFO, even though he was employed by Defendant FCMC.  Similarly, Marjan LaRue signed FCLS' bylaws as its Secretary, as well as agreements on behalf of FCLS, even though she acted as CFO for Tivoli, was employed by FCMC, and instructed banks to transfer monies from DMHFLP's bank account to FCMC.  Further, Susan Hoff prepared and/or signed several of both FCLS' and Seagull's California Secretary of State filings, even though she was an FCMC employee.  Additionally, Ellen Greene would regularly instruct banks to transfer the Defendants' funds, all the while using a Tivoli email address and an FCLS email signature.

- **Tivoli** - Marjan LaRue acted as CFO for Defendant Tivoli, yet she was employed by FCMC, signed agreements on behalf of FCLS, and instructed banks to transfer monies from DMHFLP bank accounts to FCMC.  Sally Fryer was the agent for service of process for both FCMC and Tivoli, even though she was FCMC's General Counsel.  Ellen Greene would regularly instruct banks to transfer monies from the Individual Defendants' and Entity Defendants' bank accounts to FCMC while using a Tivoli email address and an FCLS email signature.

- **DMHFLP** – DMHFLP's Nevada Secretary of State filings are signed by Susan Hoff, who was employed by FCMC, and sometimes addressed to Ellen Greene of FCLS.  Its bank statements are addressed to Ellen Greene of FCLS.

- **HFF** - Susan Hoff and Shannon Thompson, both FCMC employees, prepared or signed multiple California Secretary of State filings on behalf of HFF. Further, HFF's bank statements are addressed to Ellen Greene of FCLS.

78. These examples demonstrate that the Individual Defendants drew no practical distinctions among as between or among FCMC and the Entity Defendants—employees of one entity were routinely used to perform tasks for the others and held themselves out as agents of each. Funds were casually transferred among the entities and debts paid by one on behalf of the others. The common business purpose was to enrich the Hart family by having FCMC pay the employees, but to have them work for the Harts personally.

79. That the Individual Defendants ran FCMC and the Entity Defendants as a single enterprise for their own benefit is also evidenced by the lack of corporate formalities. Based on discovery to date, it appears that FCMC has not held a shareholder meeting from 2013 to the present, or has not kept minutes of shareholder meetings. To date, FCMC has produced only two minutes of shareholder meetings, the most recent on from 1993, 26 years ago. Further, discovery to date indicates that from 2013 to the present, the Entity Defendants have not held *any* meetings of directors, shareholders, or members or have not kept minutes of those meetings. Additionally, FCMC's and the Entity Defendants' boards of directors and/or members or managers did not appoint independent directors and/or committee's to evaluate any of their self-dealing transactions.

**F.** **FCMC Was the Individual Defendants' Alter Ego and Seagull Was Dennis Hart's Alter Ego**

80. The success of the Individual Defendants' scheme depended on their complete control of FCMC. Absent complete control and domination of FCMC's affairs, the Individual Defendants would not have been able to ensure that FCMC was consistently undercapitalized while siphoning funds out to the entities they controlled and ultimately to themselves.

81. To ensure that they maintained complete control of FCMC's affairs, the Individual Defendants did not appoint independent committees to evaluate or make recommendations on their self-dealing transactions, and ensured that only the Hart family would make those decisions. For example, Dennis Hart, Christopher Hart, and Hart-Armstrong, authorized FCMC to enter into

FIRST AMENDED COMPLAINT

a "Consulting Services Agreement" with FCLS, which allowed FCLS to *unilaterally* determine its own compensation.  Similarly, the same defendants authorized FCMC to enter into a "Consulting Services Agreement" with Seagull, and specifically required that Ralph Hints sign the agreement so that they could whitewash their conduct.  But when it suited them, the Individual Defendants unilaterally caused Seagull and FCMC to agree to retroactively re-characterize "consulting fees" already paid to Seagull as "loans."

82.     The Hart family also often signed their own alleged "Promissory Notes."  For example, Hart-Armstrong allegedly loaned FCMC $100,000 on October 14, 2014, but it was her brother Christopher Hart who signed the ostensible note on FCMC's behalf.  Likewise, Dennis Hart allegedly loaned FCMC $1,650,000 on March 31, 2017, but it was his son Christopher Hart who signed the ostensible note on FCMC's behalf.

83.     The Hart Family also shared accountants and attorneys with FCMC.  Each of the Individual Defendants, and FCMC, used Richey May & Co. as their accountant.  FCMC employed Scheer Law Group as its attorney in multiple actions.  Christopher Hart's bank statements show payments made to Scheer Law Group—either Mr. Hart was paying FCMC's legal fees, or also used Scheer Law Group as his attorney.

84.     Further, the Individual Defendants  drew few or no distinctions between themselves and the entities they controlled, including FCMC.  Just a few examples include:

- Many, if not all, of the "loans" made by Tivoli to FCMC were actually drawn from Dennis Hart's personal letter of credit.  Yet, the purported repayments were made by FCMC to Tivoli, an entity that had no liabilities or other operations.

- FCMC and Hart-Armstrong purportedly entered into a note on September 14, 2012 under which FCMC promised to repay Hart-Armstrong $250,000.  However, FCMC paid Tivoli $250,000 on October 1, 2012, to satisfy this ostensible note.

- On September 16, 2014, Christopher Hart purportedly loaned $150,000 to FCMC.  Plaintiff is informed and believes, however, that these funds originated from Entity Defendant DMHFLP's bank account.  HFF's bank statements indicate multiple deposits from "Hart" or "Hart Family" that originated from FCLS' bank accounts.

85.     Discovery to date also demonstrates that Defendant Dennis Hart used Seagull as a mere alter ego to fund his lavish lifestyle.  As noted above, Dennis Hart was Seagull's sole member and exercised complete control over it.  The vast majority of Seagull's income came from FCMC for purported "consulting" and "per file" fees, or as payments on a "letter of credit" even though those agreements were shams designed to funnel money out of FCMC and ensure that FCMC had no funds available to pay its legitimate creditors.  In fact, deposits into Seagull's bank account came to a grinding halt in December 2017, the same time that FCMC claims to have shut down its operations.  The vast majority of Seagull's assets are a seaplane, a hanger for the seaplane, and sculptures.  And its only "liabilities" were to parties related to FCMC.  For example, in 2017, $337,000 of Seagull's $346,293 in assets consisted of the seaplane, the hanger, and sculptures, while its only liability was a $40,000 note payable to DMHFLP, an entity that was also entirely owned and controlled by Dennis Hart.

## FIRST CLAIM FOR RELIEF

**Avoidance and Recovery of Intentionally Fraudulent Transfers Under Uniform Fraudulent Transfer Act, California Civil Code Sections 3439.04(a)(1) and 3439.07 (All Defendants)**

86.     Plaintiff re-alleges and incorporates herein the allegations of paragraphs 1 through 85 of this Amended Complaint as if fully set forth herein.

87.     FCMC promised Plaintiff it would pay at least $6 million pursuant to the Settlement Agreement, and that it would make the $6,679,074 Balloon Payment pursuant to the Amended Settlement Agreement.  FCMC made only the first three payments under the Settlement Agreement and did not make any further payments.

88.     Instead, from June 2014 to at least March 2018, FCMC made the Transfers to its insiders and entities controlled by its insiders, including to Defendants.  The purpose of the Transfers was to siphon money out of FCMC to benefit FCMC's insiders (including Defendants) at the expense of Plaintiff and FCMC's other creditors.

89.     FCMC's intent to hinder, delay, or defraud Plaintiff and its other creditors is evidenced by, among other things:

(a)     FCMC made the Transfers to insider Defendants Christopher Hart, Dennis Hart, Hart-Armstrong (including through their Personal Trusts), David Armstrong, and entities controlled by those insiders, including Defendants Seagull, FCLS, HFF, DMHFLP, and Tivoli.

(b)     FCMC did not disclose and actively concealed the Transfers from Plaintiff until just before it defaulted on its obligation to make the Balloon Payment. In the Amended Settlement Agreement, FCMC affirmatively represented that it would not "make payments of any kind (including dividends) to any of its affiliates or shareholders, owners, directors, officers, employees, or any of their family members or affiliates, other than reportable wages paid in amounts consistent with past practice."

(c)     FCMC made the Transfers despite the existence of perfected security interests in its assets in favor of Plaintiff.

(d)     FCMC did not receive reasonably equivalent value in exchange for the Transfers.

(e)     FCMC was insolvent at the time of making the Transfers or became insolvent as a result of the Transfers.

(f)     FCMC transferred substantially all of its assets after making the bulk of the Transfers.

(g)     FCMC ceased operations and shut down shortly after making the bulk of the Transfers.

(h)     FCMC made the Transfers during the Litigation, both before and after agreeing to pay Plaintiff the settlement amounts.  Additionally, FCMC made a number of the Transfers while another lawsuit was pending.  On December 27, 2016, Lehman Brothers Holdings, Inc. ("LBHI") sued FCMC for indemnification for liabilities and costs, fees, and expenses that LBHI incurred as a result of LBHI's sale of FCMC-originated defective mortgage loans to the Federal National Mortgage Association and the Federal Home

Loan Mortgage Corporation.  *Lehman Brothers Holdings, Inc. v. First*

*California Mortgage Co.*, 1:16-ap-01313 (Bankr. S.D.N.Y.).

90.     The Transfers of the funds to insiders and entities controlled by the insiders, as listed in **Exhibit I**, constitute a transfer of an interest of FCMC in property.  Defendants Christopher Hart, Dennis Hart, Hart-Armstrong (including through their Personal Trusts), David Armstrong, Seagull, FCLS, HFF, DMHFLP, and Tivoli were and/or are immediate, mediate, or subsequent transferees of the Transfers, which are valued at no less than $17,020,742.70.

91.     Plaintiff was harmed by Defendants' conduct.

92.     Defendants' conduct was a substantial factor in causing Plaintiff's harm.

93.     As a direct and proximate result of the conduct of each Defendant, Plaintiff suffered damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

**Avoidance and Recovery of Constructively Fraudulent Transfers Under Uniform Fraudulent Transfer Act, Civil Code Sections 3439.04(a)(2) and 3439.07 (All Defendants)**

94.     Plaintiff re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 93, inclusive, of this Amended Complaint as if fully set forth herein.

95.     As set forth herein, FCMC promised Plaintiff it would pay $6 million pursuant to the Settlement Agreement and that it would make the $6,679,074 Balloon Payment pursuant to the Amended Settlement Agreement.  FCMC only made the first three payments under the Settlement Agreement and did not make any further payments.  Instead, FCMC made the Transfers to its insiders and entities controlled by its insiders, including Defendants.

96.     FCMC's intent to hinder, delay, or defraud Plaintiff and its other creditors is evidenced by, among other things:

(a)     FCMC made the Transfers to insider Defendants Christopher Hart, Dennis Hart, Hart-Armstrong (including through their Personal Trusts), and David Armstrong, and entities controlled by those insiders, including Defendants Seagull, FCLS, the Hart Family Foundation, DMHFLP, and Tivoli.

(b)    FCMC did not disclose and actively concealed the Transfers from Plaintiff until just before it defaulted on its obligation to make the Balloon Payment. In the Amended Settlement Agreement, FCMC affirmatively represented that it would not "make payments of any kind (including dividends) to any of its affiliates or shareholders, owners, directors, officers, employees, or any of their family members or affiliates, other than reportable wages paid in amounts consistent with past practice."

(c)    FCMC made the Transfers despite the existence of perfected security interests in its assets in favor of Plaintiff.

(d)    FCMC did not receive reasonably equivalent value in exchange for the Transfers.

(e)    FCMC was insolvent at the time of making the Transfers or became insolvent as a result of the Transfers.

(f)    FCMC transferred substantially all of its assets after making the bulk of the Transfers.

(g)    FCMC ceased operations and shut down shortly after making the bulk of the Transfers.

(h)    FCMC made the Transfers during the Litigation, both before and after agreeing to pay Plaintiff the settlement amounts.  Additionally, FCMC made a number of the Transfers while another lawsuit was pending.  On December 27, 2016, Lehman Brothers Holdings, Inc. ("LBHI") sued FCMC for indemnification for liabilities and costs, fees, and expenses that LBHI incurred as a result of LBHI's sale of FCMC-originated defective mortgage loans to the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation.  *Lehman Brothers Holdings, Inc. v. First California Mortgage Co.*, 1:16-ap-01313 (Bankr. S.D.N.Y.).

97.    The Transfers of the funds to insiders and entities controlled by the insiders, as listed in **Exhibit I**, constitute a transfer of an interest of FCMC in property.  Defendants were

1   and/or are immediate, mediate, or subsequent transferees of the Transfers, which are valued at no

2   less than $17,020,742.70.

3       98.     When FCMC transferred the funds to the insiders and entities controlled by the

4   insiders, it did not receive reasonably equivalent value in exchange for the Transfers.

5       99.     When transferring the funds, (a) FCMC engaged in a transaction, or was about to

6   engage in a transaction, for which its remaining assets were unreasonably small in relation to the

7   transaction, and/or (b) intended to incur, or believed, or reasonably should have been believed it

8   would incur, debts beyond its ability to pay as they became due.

9       100.    Plaintiff was harmed by Defendants' conduct.

10      101.    Defendants' conduct was a substantial factor in causing Plaintiff's harm.

11      102.    As a direct and proximate result of the conduct of each Defendant, Plaintiff

12  suffered damages in an amount to be determined at trial.

13                          **THIRD CLAIM FOR RELIEF**

14          **Intentional Interference with Contract (Individual Defendants)**

15      103.    Plaintiff re-alleges and incorporates herein by reference the allegations of

16  paragraphs 1 through 102, inclusive, of this Amended Complaint as if fully set forth herein.

17      104.    The Settlement Agreement and Amended Settlement Agreement were valid and

18  enforceable contractual relationships between Plaintiff and FCMC.

19      105.    The Settlement Agreement and the Amended Settlement Agreement contained

20  provisions requiring payments from FCMC to Plaintiff.

21      106.    The Amended Settlement Agreement contained a provision prohibiting FCMC

22  from transferring, assigning, encumbering, or otherwise disposing of any of its assets other than in

23  the ordinary course of business for fair consideration without Plaintiff's written consent, and

24  specifically restricting any transfers of any assets, or any payments, to any of its affiliates,

25  shareholders, owners, directors, officers, employees, or family members and their affiliates other

26  than reportable wages in amounts consistent with past practice.

27

28

107.    FCMC failed to pay the amounts it owed to Plaintiff under the Settlement Agreement and the Amended Settlement Agreement.  FCMC also failed to comply with the limitations on transferring assets.

108.    Owing to their positions as managers, owners, and affiliates of closely-held FCMC, and each having approved the Settlement Agreement and Amended Settlement Agreement, each Individual Defendant had actual knowledge of FCMC's obligations under the Settlement Agreement and the Amended Settlement Agreement, including FCMC's payment obligations and its limitations on transferring assets without Plaintiff's consent.  Despite such knowledge, each Individual Defendant took substantial steps toward consummating the Transfers.

109.    The transactions necessary to effectuate the Transfers substantially disrupted FCMC's ability to perform its obligations to Plaintiff, making it impossible for FCMC to perform its obligations under the Settlement Agreement and the Amended Settlement Agreement.

110.    Each Individual Defendant understood and intended that the transactions necessary to accomplish the Transfers would result in substantial disruption of the rights and benefits afforded to Plaintiff under the Settlement Agreement and the Amended Settlement Agreement or knew that disruption of performance under the Settlement Agreement and the Amended Settlement Agreement was certain or substantially certain to occur.

111.    Plaintiff was harmed.

112.    The Individual Defendants' conduct was a substantial factor in causing Plaintiff's harm.

113.    As a direct and proximate result of the conduct of each Individual Defendant, Plaintiff suffered damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**

**Intentional Interference with Economic Advantage (Individual Defendants)**

114.    Plaintiff re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 113, inclusive, of this Amended Complaint as if fully set forth herein.

115.     The Settlement Agreement and Amended Settlement Agreement memorialized economic relationships between Plaintiffs and FCMC, with a probability of future economic benefit to FCMC.

116.     The Settlement Agreement and the Amended Settlement Agreement contained provisions requiring payments from FCMC to Plaintiff.

117.     The Amended Settlement Agreement contained a provision prohibiting FCMC from transferring, assigning, encumbering, or otherwise disposing of any of its assets other than in the ordinary course of business for fair consideration without Plaintiff's written consent, and specifically restricting any transfers of any assets, or any payments, to any of its affiliates, shareholders, owners, directors, officers, employees, or family members and their affiliates other than reportable wages in amounts consistent with past practice.

118.     FCMC failed to pay the amounts it owed to Plaintiff under the Settlement Agreement and the Amended Settlement Agreement.  FCMC also failed to comply with the limitations on transferring assets.

119.     Owing to their positions as managers, owners, and affiliates of Defendant FCMC, and each having approved the Settlement Agreement and Amended Settlement Agreement, each Individual Defendant knew of FCMC's relationship with Plaintiff, including the obligations under the Settlement Agreement and the Amended Settlement Agreement, such as FCMC's payment obligations and its limitations on transferring assets without Plaintiff's consent.  Despite such knowledge, each Individual Defendant disrupted the relationship by taking substantial steps toward consummating the Transfers.

120.     The transactions necessary to effectuate the Transfers substantially disrupted FCMC's ability to perform its obligations to Plaintiff.

121.     Each Individual Defendant intended to disrupt the relationship between FCMC and Plaintiff and/or knew that the transactions necessary to accomplish the Transfers was certain or substantially certain to result in disruption of the relationship.

122.     The conduct of each Individual Defendant was without privilege and was a substantial factor in disrupting the rights and benefits of Plaintiff and in causing Plaintiff's harm.

123.     Plaintiff was harmed by Individual Defendants' conduct.

124.     As a direct and proximate result of the conduct of each Individual Defendant, Plaintiff suffered damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Negligent Interference with Economic Advantage  (Individual Defendants)

125.     Plaintiff re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 124, inclusive, of this Amended Complaint as if fully set forth herein.

126.     At all relevant times, Defendants Christopher Hart, Dennis Hart, and Hart-Armstrong were officers and directors of FCMC.  Defendant David Armstrong was an officer of FCMC from August 2014 to September 2015, and a director from February 2017 to January 2018.

127.     At all relevant times, FCMC was insolvent given the liability it faced in the underlying litigation, the Settlement Agreement, and the Amended Settlement Agreement.

128.     The Settlement Agreement and Amended Settlement Agreement memorialize economic relationships between Plaintiff and FCMC, that probably would have resulted in future economic benefit to FCMC.

129.     The Settlement Agreement and the Amended Settlement Agreement contained provisions requiring payments from FCMC to Plaintiff.

130.     The Amended Settlement Agreement contained a provision prohibiting FCMC from transferring, assigning, encumbering, or otherwise disposing of any of its assets other than in the ordinary course of business for fair consideration without Plaintiff's written consent, and specifically restricting any transfers of any assets, or any payments, to any of its affiliates, shareholders, owners, directors, officers, employees, or family members and their affiliates other than reportable wages in amounts consistent with past practice.

131.     From June 2014 through at least March 2018, FCMC transferred at least $17,020,742.70 to the Individual Defendants and various entities they controlled, including Defendants Seagull, FCLS, the Hart Family Foundation, DMHFLP, Tivoli, and the Personal Trusts.

132.    FCMC failed to pay the amounts it owed to Plaintiff under the Settlement Agreement and the Amended Settlement Agreement.  FCMC also failed to comply with the limitations on transferring assets.

133.    Owing to their positions as managers, owners, and affiliates of Defendant FCMC, which was insolvent, the Individual Defendants owed Plaintiff a duty not to engage in self-dealing or to cause FCMC to make preferential payments.  Nevertheless, the Individual Defendants caused FCMC to engage in self-dealing and to make preferential payments via the Transfers.

134.    Additionally, owing to their positions as managers, owners, and affiliates of Defendant FCMC, and in the case of Defendant Christopher Hart, having approved the Settlement Agreement and Amended Settlement Agreement, each Individual Defendant knew or should have known of FCMC's relationship with Plaintiff, including the obligations under the Settlement Agreement and the Amended Settlement Agreement, such as FCMC's payment obligations and its limitations on transferring assets without Plaintiff's consent.  Despite such knowledge, each Individual Defendant disrupted the relationship by taking substantial steps toward consummating the Transfers.  Each Individual Defendant was aware or should have been aware that if he or she did not act with reasonable care, his or her action would interfere with the relationship and cause Plaintiff to lose in whole or in part on the advantage of the relationship.

135.    Each Individual Defendant nevertheless failed to act with reasonable care, including by disrupting the rights and benefits of Plaintiff under the Settlement Agreement and Amended Settlement Agreement, making it impossible for FCMC to perform its obligations under those Agreements.

136.    The transactions necessary to effectuate the Transfers disrupted FCMC's ability to perform its obligations to Plaintiff.

137.    The conduct of each Individual Defendant was without privilege and was a substantial factor in disrupting the rights and benefits of Plaintiff and in causing Plaintiff harm.

138.    Plaintiff was harmed by Individual Defendants' conduct.

139.    As a direct and proximate result of the conduct of each Individual Defendant, Plaintiff suffered damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Conversion (All Defendants)

140.    Plaintiff re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 139, inclusive, of this Amended Complaint as if fully set forth herein.

141.    By virtue of its valid, perfected, and enforceable lien rights, Plaintiff has a property interest in all of FCMC's assets.

142.    Defendants have intentionally and substantially interfered with Plaintiff's property interest by withholding and taking possession of FCMC's assets via the Transfers.

143.    Plaintiff did not consent to Defendants' unlawful withholding and taking of FCMC's assets.

144.    Plaintiff was harmed by Defendants' unlawful withholding and taking of FCMC's assets.

145.    Defendants were a substantial factor in causing Plaintiff's harm.

146.    As a direct and proximate result of the conduct of each Defendant, Plaintiff suffered damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty (Individual Defendants)

147.    Plaintiff re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 146, inclusive, of this Amended Complaint as if fully set forth herein.

148.    Plaintiff was a creditor of FCMC at all relevant times.

149.    FCMC was insolvent at all relevant times, in part because of its liability to RFC in the Litigation and the amounts it owed RFC under the Settlement Agreement and Amended Settlement Agreement.

150.    While FCMC was insolvent, the Individual Defendants, as directors of FCMC, had a duty to avoid actions that divert, dissipate, or unduly risk FCMC's assets that might otherwise have been used to pay Plaintiff's claims.  The Individual Defendants had a duty to avoid actions that involve self-dealing or the preferential treatment of creditors.

1     151.    The Individual Defendants breached their duties by transferring monies out of

2   FCMC and to themselves and entities they controlled under the pretext of paying salaries, notes,

3   interest, loan fees, distributions, professional fees, and subleases.

4     152.    Plaintiff was harmed by Individual Defendants' conduct.

5     153.    As a direct and proximate result of the conduct of each Individual Defendant,

6   Plaintiff suffered damages in an amount to be determined at trial.

7   **EIGHTH CLAIM FOR RELIEF**

8   **Declaratory Relief (All Defendants Except David Armstrong)**

9     154.    Plaintiff re-alleges and incorporates herein by reference the allegations of

10  paragraphs 1 through 153, inclusive, of this Amended Complaint as if fully set forth herein.

11    155.    An actual controversy has arisen and now exists between Plaintiff and Defendants.

12  Plaintiff contends, but is informed and believes that Defendants deny, that: 1) each of the Entity

13  Defendants is liable to the Plaintiff for the amounts due under the Settlement Agreement,

14  Amended Settlement Agreement, and Amended Judgment because they operated as a single

15  business enterprise; 2) Defendants Dennis Hart, Christopher Hart, and Hart-Armstrong are liable

16  to the Plaintiff for the amounts due under the Settlement Agreement, Amended Settlement

17  Agreement, and Amended Judgment because they were FCMC's alter egos; and 3) Defendant

18  Dennis Hart is liable to the Plaintiff for the amounts due under the Settlement Agreement,

19  Amended Settlement Agreement, and Amended Judgment because he was Seagull's alter ego, and

20  Seagull operated as part of a single business enterprise with FCMC.

21    156.    FCMC and the Entity Defendants operated as a single business enterprise.  Plaintiff

22  is informed and believes that there is such unity of ownership between FCMC and the Entity

23  Defendants that their separate personalities do not in reality exist.  Additionally, it would be

24  inequitable if the result of the acts of FCMC are treated as those of FCMC alone.  That is because

25  if the acts of FCMC are treated as those of FCMC alone, Defendants will have been allowed to

26  abuse the corporate form to funnel funds out of FCMC to various entities that they control and that

27  have no functions or operations other than to insulate assets from FCMC's creditors.

28

FIRST AMENDED COMPLAINT

157.    The Individual Defendants Dennis Hart, Christopher Hart, and Hart-Armstrong are the alter egos of FCMC.  Plaintiff is informed and believes that there is such a unity of interest and ownership between FCMC and the Individual Defendants that the separate personalities of FCMC and the Individual Defendants do not in reality exist.  Additionally, it would be inequitable if the result of the acts of FCMC are treated as those of FCMC alone.  That is because if the acts of FCMC are treated as those of FCMC alone, Defendants will have been allowed to abuse the corporate form so that they could siphon money out of FCMC to fund their lavish lifestyles, to the detriment of FCMC's legitimate creditors, including Plaintiff.

158.    Individual Defendant Dennis Hart is an alter ego of Seagull.  There is such a unity of interest and ownership between Dennis Hart and Seagull that the separate personalities of Dennis Hart and Seagull do not in reality exist.  Additionally, it would be inequitable if the result of the acts of FCMC are treated as those of FCMC alone, but rather, they should be treated as the acts of Seagull, and in turn, Dennis Hart.  That is because if the acts of FCMC are treated as those of FCMC alone, Defendants will have been allowed to abuse the corporate form so that they could siphon money out of FCMC to insulate assets from FCMC's creditors and to fund their lavish lifestyles, to the detriment of FCMC's legitimate creditors, including Plaintiff.

159.    Plaintiff desires a judicial determination of the respective rights and duties of Plaintiff and Defendants with respect to the foregoing.  In particular, Plaintiff desires a declaration that 1) each of the Entity Defendants is liable to the Plaintiff for the amounts due under the Settlement Agreement, Amended Settlement Agreement, and Amended Judgment because they operated as a single business enterprise; 2) Defendants Dennis Hart, Christopher Hart, and Hart-Armstrong are liable to the Plaintiff for the amounts due under the Settlement Agreement, Amended Settlement Agreement, and Amended Judgment because they were FCMC's alter egos; and 3) Defendant Dennis Hart is liable to the Plaintiff for the amounts due under the Settlement Agreement, Amended Settlement Agreement, and Amended Judgment because he was Seagull's alter ego, and Seagull operated as part of a single business enterprise with FCMC.  Such a declaration is necessary and appropriate at this time in order to ensure that Plaintiff may ascertain

1   its rights with respect to the Settlement Agreement, Amended Settlement Agreement, and

2   Amended Judgment.

3                                    **PRAYER FOR RELIEF**

4           Based on the foregoing, Plaintiff respectfully requests that the Court enter judgment in its

5   favor and against Defendants, and each of them, jointly and severally, as follows:

6           a)      Avoidance and recovery of the Transfers set forth in this Amended Complaint and

7                   any other transfers made in violation of the California Uniform Fraudulent Transfer

8                   Act;

9           b)      A preliminary injunction and permanent injunction enjoining Defendants and their

10                  officers, agents, servants, employees, affiliates, representatives, successors, assigns,

11                  heirs, legatees, executors, administrators, estate, and all persons acting in concert

12                  with any such persons, during the pendency of this action until all amounts owing

13                  to Plaintiff have been paid in full, from directly or indirectly transferring, selling,

14                  assigning, pledging, encumbering, hypothecating, or in any way disposing of any of

15                  FCMC's assets and any proceeds derived from such assets;

16          c)      Compensatory and incidental damages in an amount to be proven at trial;

17          d)      Punitive damages in an amount to be proven at trial;

18          e)      A declaratory judgment that each of the Entity Defendants is liable to Plaintiff for

19                  amounts due under the Settlement Agreement, Amended Settlement Agreement,

20                  and Amended Judgment, and that each of Dennis Hart, Christopher Hart, and Hart-

21                  Armstrong are liable to Plaintiff for the amounts due under the Settlement

22                  Agreement, Amended Settlement Agreement, and Amended Judgment.

23          f)      An award of all costs and attorneys' fees incurred in connection with this action to

24                  the maximum extent afforded by law;

25          g)      An award of pre- and post-judgment interest; and

26          h)      Any and all such other relief as may be deemed appropriate by the Court.

27

28

FIRST AMENDED COMPLAINT

1    DATED:  July 25, 2019                    FINESTONE HAYES LLP

2

3

4                                            By:_Jennifer C. Hayes_____
                                                Jennifer Hayes
5

6

7                                            QUINN EMANUEL URQUHART &
                                             SULLIVAN LLP
8                                            Anthony P. Alden

9
                                             Attorneys for Plaintiff ResCap Liquidating
10                                           Trust

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                              FIRST AMENDED COMPLAINT